**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| IRVING FELDBAUM, Derivatively on Behalf of MISONIX, INC., | X : | Index No. |
| Plaintiff, | : : : | VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR |
| v. | : : | VIOLATION OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, |
| STAVROS G. VIZIRGIANAKIS, RICHARD A. ZAREMBA, JOHN W. GILDEA, CHARLES MINER III, PATRICK A. MCBRAYER, THOMAS M. PATTON, MICHAEL A. MCMANUS, JR., and T. GUY MINETTI, | : : : : : : | WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT |
| Defendants, | : : : | |
| -and- | : : | |
| MISONIX, INC., a New York corporation, | : : | |
| Nominal Defendant. | : : X | DEMAND FOR JURY TRIAL |

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge.  This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of the public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.       This is a stockholder derivative action brought on behalf of nominal defendant Misonix, Inc. ("Misonix" or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law.  These wrongs resulted in tens of millions of dollars in damages to Misonix's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed the Company to tens of millions of dollars in potential liability for violations of state and federal law.

2.       Misonix designs, manufactures, develops, and markets minimally invasive therapeutic ultrasonic medical devices.  The Company's products are sold in all major markets in the Americas, Europe, Middle East, Asia Pacific, and Africa.

3.       This action concerns the harm caused to the Company by the defendants due to their responsibility for a series of improper statements concerning Misonix's business and financial health, as well as their potential violations of the Foreign Corrupt Practices Act (the "FCPA").  Specifically, the defendants, Misonix's directors and officers, made, approved, and certified improper financial statements contained within the Company's filings with the SEC.  In those filings, the defendants regularly touted that Misonix's "disclosure controls and procedures ... are

- 1 -

designed to ensure that information required to be disclosed in the reports that [Misonix] file[s] or submit[s] under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC," and that "the Company's disclosure controls and procedures are effective." As Misonix was later forced to admit, however, the above statements were woefully inaccurate when made.

4.      On August 29, 2016, Misonix announced that, effective September 2, 2016, defendant Michael A. McManus, Jr. ("McManus") was "resigning" as a director and Chairman of the Board of Directors (the "Board") of Misonix, and "retiring" as the Company's President and Chief Executive Officer ("CEO"). The Company did not provide any explanation at the time for defendant McManus' retirement/resignation. Further, as detailed herein, the Company agreed to continue to pay his salary and other benefits through at least June 30, 2017.

5.      On September 14, 2016, Misonix filed a Notification of Late Filing on Form 12b-25 with the SEC vaguely revealing that the Company was unable to timely file its Annual Report on Form 10-K for the fiscal year ended June 30, 2016 (the "2016 Form 10-K"), with the SEC due to undisclosed "deficiencies [that] existed in the Company's internal control over financial reporting at June 30, 2016."

6.      In the wake of the above disclosure, Misonix's stock plunged more than 18%, or $1.13 per share on September 15, 2016, to close at $5 compared to the previous trading day's closing of $6.13, erasing over $8.8 million in market capitalization.

7.      On September 28, 2016, the Company filed a Current Report on Form 8-K with the SEC. The Form 8-K disclosed that Misonix "contacted the [SEC] and the U.S. Department of Justice ("DOJ") to voluntarily inform both agencies that the Company may have had knowledge of certain business practices of the independent Chinese entity that distributes its products in China,

which practices raise questions under the [FCPA]."  The SEC and DOJ thereafter began investigating matters relating to the potential FCPA violations as well as "various internal controls issues" at Misonix.

8.     The Company did not provide any substantive updates on these matters until February 9, 2017, when Misonix finally filed its long delayed 2016 Form 10-K.  The 2016 Form 10-K revealed for the first time that since at least April 2016, five months *before* defendant McManus "retired" and the Company filed the above noted Notification of Late Filing, the Board knew of significant improprieties at Misonix involving defendant McManus and other undisclosed fiduciaries.  Specifically, according to the 2016 Form 10-K, in "April 2016, the Company's management informed the Board of violations of Company policies and procedures and possible violations of laws and regulations, involving [defendant] McManus ... and other Company personnel."  The 2016 Form 10-K further disclosed that an investigation by the Audit Committee of the Board, which began in May 2016, found "material weaknesses in internal control over [the Company's] financial reporting" and that Misonix's "disclosure controls and procedures were not effective, and were not operating at a reasonable assurance level, as of June 30, 2016."  The Audit Committee investigation has concluded, but the Company has failed to disclose any findings of wrongdoing.  The SEC and DOJ investigations remain pending.

9.     To make matters worse, on December 30, 2015, the Individual Defendants (as defined herein) issued a materially misleading proxy statement urging stockholders to vote to approve executive compensation packages, among other things.  In seeking stockholder votes in accord with the Board's recommendations, the proxy statement omitted material information concerning, among other things, the Company's inadequate internal controls.  Further, the proxy statement improperly suggested that the Company would terminate defendant McManus for cause if

- 3 -

appropriate, and also misrepresented that the salaries paid to executives (such as defendant McManus) are based on individual performance and the Company's performance. Indeed, the Company ultimately refused to terminate defendant McManus for cause even after learning that he violated Company policies and procedures, and thereafter continued (and still continues) to pay his salary.

10.     To date, the Company has incurred at least $2.1 million investigating the wrongdoing, and is expected to incur additional related costs "until the matter is fully resolved." Further, as noted in Misonix's recent 2016 Form 10-K, "the Company could be subject to disgorgement, fines or penalties related to potential violations of the FCPA." More, as a direct result of this unlawful course of conduct, the Company is now the subject of at least one federal securities class action lawsuit filed in the United States District Court for the Eastern District of New York on behalf of investors who purchased Misonix's shares from November 5, 2015 through September 14, 2016 (the "Securities Class Action"). The Securities Class Action alleges that Misonix and certain Individual Defendants made false and/or misleading statements in the Company's SEC filings and failed to disclose the Company's deficient internal controls.

11.     Plaintiff brings this action to hold the Individual Defendants accountable for their wrongdoing and correct the wrongs these defendants wrought.

## JURISDICTION AND VENUE

12.     Pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

13.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper under 28 U.S.C. §1391(a) because Misonix maintains offices within this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

15.     Plaintiff Irving Feldbaum was a stockholder of Misonix at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Misonix stockholder.

**Nominal Defendant**

16.     Nominal Defendant Misonix is a New York corporation with principal executive offices located at 1938 New Highway, Farmingdale, New York. Misonix designs, manufactures, develops, and markets ultrasonic medical devices for neurosurgical, spinal, advanced wound care, and general surgery procedures. As of June 30, 2016, the Company had eighty-five full time employees and operates in over forty-five countries.

**Defendants**

17.     Defendant Stavros G. Vizirgianakis ("Vizirgianakis") is Misonix's President and CEO and has been since December 2016 and a director and has been since May 2013. Defendant Vizirgianakis was also Misonix's Interim CEO from September 2016 to December 2016.

Defendant Vizirgianakis was a member of Misonix's Compensation and Corporate Governance Committee from February 2016 to at least August 2016. Defendant Vizirgianakis knowingly, recklessly, or with gross negligence: (i) maintained an improper "tone at the top" at Misonix; (ii) failed to ensure adequate internal controls at Misonix; (iii) caused or allowed the Individual Defendants to make improper representations in the Company's SEC filings concerning the Company's deficient internal controls; and (iv) caused or allowed the former CEO, defendant McManus, and other personnel to violate Company policies and procedures, laws, and/or regulations, without repercussion. Defendant Vizirgianakis also negligently violated section 14(a) of the Exchange Act by causing Misonix to make misleading statements in its proxy statement. Misonix paid defendant Vizirgianakis the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2015 | $16,000 | $60,000 | $76,000 |

18.     Defendant Richard A. Zaremba ("Zaremba") is Misonix's Secretary and Treasurer and has been since March 1999; Senior Vice President and has been since September 2004; and Senior Vice President, Finance and has been since September 2016. Defendant Zaremba was also Misonix's Chief Financial Officer ("CFO") from February 1999 to September 2016 and Vice President from February 1999 to September 2004. Defendant Zaremba is named as a defendant in the Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Zaremba knowingly, recklessly, or with gross negligence: (i) maintained an improper "tone at the top" at Misonix; (ii) failed to ensure adequate internal controls at Misonix; (iii) caused or allowed the Individual Defendants to make improper representations in the Company's SEC filings concerning the Company's deficient internal controls; and (iv) caused or allowed the former CEO, defendant McManus, and other personnel to violate Company policies and procedures, laws, and/or

- 6 -

regulations, without repercussion. Misonix paid defendant Zaremba the following compensation as an executive:

| Year | Salary | Bonus | Option Awards | Total |
|------|--------|-------|---------------|-------|
| 2015 | $226,038 | $20,000 | $178,374 | $424,412 |

19.     Defendant John W. Gildea ("Gildea") is a Misonix director and has been since January 2005. Defendant Gildea is a member of Misonix's Audit Committee and has been since at least April 2017. Defendant Gildea was a member of Misonix's Audit Committee from at least December 2014 to at least December 2015 and a member of the Compensation and Corporate Governance Committee from at least December 2014 to at least June 2016. Defendant Gildea knowingly or recklessly: (i) maintained an improper "tone at the top" at Misonix; (ii) failed to ensure adequate internal controls at Misonix; (iii) caused or allowed the Individual Defendants to make improper representations in the Company's SEC filings concerning the Company's deficient internal controls; and (iv) caused or allowed the former CEO, defendant McManus, and other personnel to violate Company policies and procedures, laws, and/or regulations, without repercussion. Defendant Gildea also negligently violated section 14(a) of the Exchange Act by causing Misonix to make misleading statements in its proxy statement. Misonix paid defendant Gildea the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|-------------|-------------------|---------------|-------|
| 2015 | $20,000 | $60,000 | $80,000 |

20.     Defendant Charles Miner III ("Miner") is a Misonix director and has been since August 2005. Defendant Miner is also a member of Misonix's Compensation Committee and has been since October 2016. Defendant Miner was a member of Misonix's Compensation and Corporate Governance Committee from at least December 2014 to October 2016 and a member of

the Audit Committee from at least December 2014 to at least December 2015. Defendant Miner knowingly or recklessly: (i) maintained an improper "tone at the top" at Misonix; (ii) failed to ensure adequate internal controls at Misonix; (iii) caused or allowed the Individual Defendants to make improper representations in the Company's SEC filings concerning the Company's deficient internal controls; and (iv) caused or allowed the former CEO, defendant McManus, and other personnel to violate Company policies and procedures, laws, and/or regulations, without repercussion. Defendant Miner also negligently violated section 14(a) of the Exchange Act by causing Misonix to make misleading statements in its proxy statement. Misonix paid defendant Miner the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2015 | $20,000 | $60,000 | $80,000 |

21.     Defendant Patrick A. McBrayer ("McBrayer") is a Misonix director and has been since September 2014. Defendant McBrayer is the Chairman of Misonix's Compensation Committee and a member of that committee, and a member of the Audit Committee and has been since at least April 2017. Defendant McBrayer was also a member of the Audit Committee in at least December 2015. Defendant McBrayer knowingly or recklessly: (i) maintained an improper "tone at the top" at Misonix; (ii) failed to ensure adequate internal controls at Misonix; (iii) caused or allowed the Individual Defendants to make improper representations in the Company's SEC filings concerning the Company's deficient internal controls; and (iv) caused or allowed the former CEO, defendant McManus, and other personnel to violate Company policies and procedures, laws, and/or regulations, without repercussion. Defendant McBrayer also negligently violated section 14(a) of the Exchange Act by causing Misonix to make misleading statements in its proxy statement. Misonix paid defendant McBrayer the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2015 | $7,000 | $60,000 | $67,000 |

22.     Defendant Thomas M. Patton ("Patton") is a Misonix director and has been since September 2015. Defendant Patton is the Chairman of Misonix's Audit Committee and a member of that committee, and a member of the Compensation Committee and has been since at least April 2017. Defendant Patton knowingly or recklessly: (i) maintained an improper "tone at the top" at Misonix; (ii) failed to ensure adequate internal controls at Misonix; (iii) caused or allowed the Individual Defendants to make improper representations in the Company's SEC filings concerning the Company's deficient internal controls; and (iv) caused or allowed the former CEO, defendant McManus, and other personnel to violate Company policies and procedures, laws, and/or regulations, without repercussion. Defendant Patton also negligently violated section 14(a) of the Exchange Act by causing Misonix to make misleading statements in its proxy statement.

23.     Defendant Michael A. McManus, Jr. ("McManus") was Misonix's President, CEO, and a director from October 1998 to September 2016 and Chairman of the Board from at least November 2010 to September 2016. Defendant McManus is named as a defendant in the Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant McManus knowingly, recklessly, or with gross negligence: (i) violated Company policies and procedures and potentially certain as yet undisclosed laws and regulations; (ii) maintained an improper "tone at the top" at Misonix; (iii) failed to ensure adequate internal controls at Misonix; (iv) caused or allowed the Individual Defendants to make improper representations in the Company's SEC filings concerning the Company's deficient internal controls; and (v) caused or allowed other personnel to violate Company policies and procedures, laws, and/or regulations, without repercussion. Misonix paid defendant McManus the following compensation as an executive:

- 9 -

| Year | Salary | Bonus | Option Awards | Total |
|---|---|---|---|---|
| 2015 | $290,008 | $100,000 | $1,314,695 | $1,704,703 |

24. Defendant T. Guy Minetti ("Minetti") was a Misonix director from March 2003 to December 2016. Defendant Minetti was the Chairman of Misonix's Audit Committee and a member of that committee from at least December 2014 to at least December 2015. Defendant Minetti was also a member of Misonix's Compensation and Corporate Governance Committee from at least December 2014 to at least June 2016. Defendant Minetti knowingly or recklessly: (i) maintained an improper "tone at the top" at Misonix; (ii) failed to ensure adequate internal controls at Misonix; (iii) caused or allowed the Individual Defendants to make improper representations in the Company's SEC filings concerning the Company's deficient internal controls; (iv) caused or allowed the former CEO, defendant McManus, and other personnel to violate Company policies and procedures, laws, and/or regulations, without repercussion. Defendant Minetti also negligently violated section 14(a) of the Exchange Act by causing Misonix to make misleading statements in its proxy statement. Misonix paid defendant Minetti the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2015 | $25,000 | $60,000 | $85,000 |

25. The defendants identified in ¶¶17-18, 23 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶17, 19-24 are referred to herein as the "Director Defendants." The defendants identified in ¶¶19-21 are referred to herein as the "Audit Committee Defendants." Collectively, the defendants identified in ¶¶17-24 are referred to herein as the "Individual Defendants."

- 10 -

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

26.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Misonix and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Misonix in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Misonix and not in furtherance of their personal interest or benefit.

27.     To discharge their duties, the officers and directors of Misonix were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Misonix were required to, among other things:

        (a)     maintain a proper "tone at the top";

        (b)     ensure and maintain adequate internal controls at the Company;

        (c)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

        (d)     remain informed as to how Misonix conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Additional Duties of the Audit Committee Defendants**

28.   In addition to these duties, under its Charter, the Audit Committee Defendants, defendants Gildea, Miner, and McBrayer, owed specific duties to Misonix to assist the Board in overseeing the Company's accounting and financial reporting process and the audit of the Company's financial statements.   Moreover the Audit Committee's Charter provides that the "primary role of the [Audit] Committee is to oversee the financial reporting and disclosure process."   The Audit Committee was further specifically required:

- To review with management and the Company's independent auditors the adequacy and effectiveness of the Company's financial reporting processes, internal control over financial reporting and disclosure controls and procedures, including any significant deficiencies or material weaknesses in the design or operation of, and any material changes in, the Company's processes, controls and procedures and any special audit steps adopted in light of any material control deficiencies, and any fraud involving management or other employees with a significant role in such processes, controls and procedures, and review and discuss with management and the Company's independent auditors disclosure relating to the Company's financial reporting processes, internal control over financial reporting and disclosure controls and procedures, and if applicable, the independent auditors' report on the effectiveness of the Company's internal control over financial reporting to be included in or attached as exhibits to the Company's annual report on Form 10-K.

\* \* \*

- To establish and oversee procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and the confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

\* \* \*

- To review the Company's compliance with applicable laws and regulations and to review and oversee the Company's policies, procedures and programs designed to promote and monitor legal, ethical and regulatory compliance.

**Breaches of Duties**

29.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Misonix, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

30.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to operate with inadequate internal controls and misrepresent the Company's business, operations, and prospects, improper practices that wasted the Company's assets, and caused Misonix to incur substantial damage.

31.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Misonix, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. As a result, and in addition to the damage the Company has already incurred, Misonix has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

32.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

33.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing

public, including stockholders of Misonix, regarding the Individual Defendants' management of Misonix's operations and the adequacy of the Company's internal controls; and (ii) enhance the Individual Defendants' executive and directorial positions at Misonix and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.   In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

34.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

35.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

36.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

37.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that

- 14 -

wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## IMPROPER STATEMENTS

38.     On November 5, 2015, Misonix filed its Quarterly Report on Form 10-Q with the SEC, which announced the Company's financial and operating results for the first quarter ended September 30, 2015.  The Form 10-Q, which was signed by defendants McManus and Zaremba, misrepresented that the Company's disclosure controls and procedures, and internal controls over financial reporting were effective, stating:

**Item 4. Controls and Procedures.**

*Evaluation of Disclosure Controls and Procedures*

Our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) are designed to ensure that information required to be disclosed in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC and that such information is accumulated and communicated to management, including the Chief Executive Officer and Chief Financial Officer, to allow timely decision regarding required disclosures. The Company carried out an evaluation, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures as of September 30, 2015 and, based on their evaluation, the Chief Executive Officer and Chief Financial Officer concluded that *the Company's disclosure controls and procedures are effective*.

*Changes in Internal Control Over Financial Reporting*

There has been no change in the Company's internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act) that occurred during the three months ended September 30, 2015 that has materially affected, or is reasonable likely to materially affect, the Company's internal control over financial reporting.

39.     The Form 10-Q also included certifications signed by defendants McManus and Zaremba pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") certifying that the Form 10-Q was accurate and complete, and that the Individual Defendants had established appropriate internal controls, stating:

I, [defendant McManus/Zaremba] certify that:

1. I have reviewed this quarterly report on Form 10-Q of MISONIX, INC.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) *Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared*;

(b) *Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*;

(c) *Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation*; and

(d) *Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting*; and

5. *The registrant's other certifying officer(s) and I have disclosed*, based on our most recent evaluation of internal control over financial reporting, to the

registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information*; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

40.     On February 9, 2016, Misonix filed its Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the second quarter ended December 31, 2015. The Form 10-Q was signed by defendants McManus and Zaremba, and included substantially similar misleading statements as the first quarter Form 10-Q concerning the Company's purportedly effective disclosure controls and procedures, and further included substantially similar SOX certifications signed by defendants McManus and Zaremba.

41.     On May 5, 2016, one month after, unbeknownst to the public at the time, "the Company's management informed the Board of violations of Company policies and procedures and possible violations of laws and regulations, involving [defendant] McManus ... and other Company personnel," Misonix filed its Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the third quarter ended March 31, 2016. The Form 10-Q was signed by defendants McManus and Zaremba, and included substantially similar misleading statements as the prior quarters' Forms 10-Q concerning the Company's purportedly effective disclosure controls and procedures, and further included substantially similar SOX certifications signed by defendants McManus and Zaremba.

42.     On August 29, 2016, four months after the Board learned of defendant McManus' and other Company personnel's violations of Misonix's policies and procedures and possible violations of laws and regulations, the Company issued a press release announcing that, effective

September 2, 2016, defendant McManus was "resigning" as a director and Chairman of the Board, and "retiring" as the Company's President and CEO. The Company did not provide any explanation at the time for defendant McManus' retirement/resignation. The press release stated:

> FARMINGDALE, N.Y., Aug. 29, 2016 /PRNewswire/ -- Misonix, Inc. (NASDAQ: MSON), an international surgical device company that designs, manufactures and markets innovative therapeutic ultrasonic products for spine surgery, neurosurgery, wound debridement, skull based surgery, laparoscopic surgery and other surgical applications, announced that, effective September 2, 2016, Michael A. McManus, Jr. is resigning as a Director and Chairman of the Board of Directors of Misonix and retiring as the Company's President and Chief Executive Officer.
>
> Effective September 2, 2016, Stavros G. Vizirgianakis, a member of the Misonix Board of Directors, will serve, on an unpaid basis, as Misonix's interim Chief Executive Officer. Misonix and Mr. Vizirgianakis are in negotiations for him to accept employment as Misonix's full-time Chief Executive Officer.
>
> Mr. Vizirgianakis has served on the Misonix Board since May 2013. He holds a 5.7% ownership stake in Misonix. He has been involved with Misonix as early as September 2010 as the owner of a company acting as Misonix's South African distributor.
>
> Mr. Vizirgianakis said, "I am honored to be asked to serve as interim Chief Executive Officer and am excited about the Company's products and future. The Misonix team will no doubt continue to put forth their best efforts to design, develop and manufacture cutting-edge technology for the medical device field."
>
> Mr. McManus commented, "After 16 years as CEO, I retire with gratitude for the dedicated professionals who have contributed to the Company's innovation and growth, and with great confidence in the Company's future potential and the leadership of Stavros Vizirgianakis. I look forward to doing whatever I can to be helpful to him as he transitions to his new role."

## THE INDIVIDUAL DEFENDANTS CAUSE MISONIX TO FILE A MATERIALLY MISLEADING PROXY

43.     On December 31, 2015, defendants McManus, Vizirgianakis, Gildea, Miner, McBrayer, Patton, and Minetti caused Misonix to issue a Proxy Statement in connection with the 2016 Annual Meeting of Shareholders, held on February 4, 2016 (the "Proxy"). In the Proxy, defendants solicited stockholder votes to, among other things, conduct an advisory vote on the compensation of the Company's named executive officers. Defendants issued materially

misleading statements with respect to this vote.  The Proxy stated the following in support of the requested approval:

## EXECUTIVE COMPENSATION

**Compensation Discussion and Analysis**

**Overview of Compensation Program and Philosophy**

Our compensation program is intended to:

>   • *Attract, motivate, retain and reward employees of outstanding ability*;

>   • *Link changes in employee compensation to individual and corporate performance*;

>   • *Align employees' interests with those of the Company's shareholders.*

*The ultimate objective of our compensation program is to increase shareholder value. We seek to achieve these objectives with a total compensation approach which takes into account a competitive base salary, bonus pay based on the annual performance of the Company and individual goals and stock option awards.*

**Base Salaries**

Base salaries paid to executives are intended to attract and retain highly talented individuals. *In setting base salaries, individual experience, individual performance, the Company's performance and job responsibilities during the year are considered.* Executive salaries are reconciled by Human Resources and evaluated against local companies of similar size and nature.

*  *  *

**Employment Agreement**

On May 22, 2015, the Employment Agreement, dated July 1, 2014, by and between Michael A. McManus, Jr. and the Company was mutually terminated and replaced by a new Employment Agreement whereby Mr. McManus will continue to serve as the Company's President and Chief Executive Officer (the "McManus Agreement"). The McManus Agreement, effective as of May 22, 2015, has an initial term expiring June 30, 2017 and renews for successive one-year periods thereafter unless terminated by either party not less than ninety (90) days prior to the end of the then-current term. The McManus Agreement provides for an annual base salary of (i) $299,000 through June 30, 2015 and (ii) $325,000 commencing July 1, 2015, and an annual bonus based on Mr. McManus' achievement of annual goals and objectives as determined by the Compensation Committee of the Company's Board of Directors. Mr. McManus also received a one-time grant of options to purchase 100,000 shares

- 19 -

of Common Stock at an exercise price of $11.88 per share (the "McManus Options"). The McManus Options vest in their entirety on June 30, 2017.

Mr. McManus is entitled under the McManus Agreement to participate in any plans and programs made available to the executive employees of the Company generally.

*The Company can terminate the McManus Agreement for cause* (as defined in the McManus Agreement). Mr. McManus can terminate the McManus Agreement for good reason (as defined in the McManus Agreement). If Mr. McManus terminates the McManus Agreement for good reason, the Company must (i) pay him an amount equal to two times his total compensation (annual base salary plus bonus) at the highest rate paid him at any time during the aggregate time he has been employed by the Company, payable in a lump sum within sixty days of termination of employment, and (ii) pay premiums for medical, dental, vision, hospitalization and long term care coverage under Company plans for a period of twenty-four (24) months.

44.    Defendants' statements misleadingly conveyed that Misonix's compensation structures were intended to: (i) motivate and reward employees of outstanding ability; (ii) link salaries to individual and corporate performance; (iii) align employee interests with those of the Company's stockholders; and (iv) increase stockholder value.  Defendants' statements further misleadingly suggested that the Company would terminate defendant McManus for cause if appropriate.  In contrast, as revealed by the 2016 Form 10-K, the Board refused to terminate defendant McManus for cause despite finding that he violated Company policies and procedures and was largely responsible for the wrongdoing detailed herein.  Further, despite the fact that defendant McManus' actions significantly harmed the Company and its stockholders, the Board caused or allowed the Company to indemnify defendant McManus and continue to pay his salary and medical premiums through June 30, 2017, and the Compensation Committee approved a $100,000 bonus to defendant McManus "based on performance in the fiscal 2015 year."

45.    As a result of defendants' misleading statements, numerous Misonix stockholders voted in support of the advisory resolution regarding compensation to defendant McManus and the other named executives, without the benefit of material information regarding the Individual Defendants' continued and ongoing failure to control deficiencies at Misonix, and disregard for the intended purpose of the Company's executive compensation structures and defendant McManus'

employment agreement.

### **THE TRUTH IS SLOWLY, AND ONLY PARTIALLY, REVEALED**

46.     The truth behind the Company's inadequate controls and the Individual Defendants' wrongdoing began to slowly emerge on September 14, 2016, when Misonix filed a Notification of Late Filing on Form 12b-25 with the SEC.  The notification revealed that Misonix was unable to timely file its 2016 Form 10-K with the SEC due to deficiencies in the Company's internal control over financial reporting.  The notification stated:

> The Audit Committee of MISONIX, INC. (the "Company") has determined that *deficiencies existed in the Company's internal control over financial reporting at June 30, 2016.* The Audit Committee is still considering whether or not the deficiencies constitute one or more material weaknesses in the Company's internal control over financial reporting at such date. Notwithstanding its determination, the Audit Committee has no current information to suggest that the Company's previously reported financial statements and results are incorrect in any material respect. *The filing of the Company's Annual Report on Form 10- K for the fiscal year ended June 30, 2016 will be delayed pending completion of an investigation relating to these deficiencies being overseen by the Audit Committee.* The filing may also be delayed as a result of the appointment effective September 13, 2016 by the Board of Directors of the Company of Joseph Dwyer as Interim Chief Financial Officer. Richard A. Zaremba, Senior Vice President and Chief Financial Officer through September 13, 2016, has been appointed Senior Vice President, Finance. The Company is filing a Current Report on Form 8-K which goes in to greater detail on the foregoing management changes. As a result of the foregoing, it is likely that the Company will not be in a position to file its Annual Report on Form 10-K within the 15-day extension period provided in Rule 12b-25(b). The Company is working diligently to resolve these matters and intends to file its Annual Report on Form 10-K as promptly as reasonably practicable.

47.     On this news, Misonix's market capitalization plunged more than 18%, or $1.13 per share, on September 15, 2016, to close at $5 compared to the previous trading day's closing of $6.13, erasing over $8.8 million in market capitalization in a single day.

48.     A few weeks later, on September 28, 2016, the Company filed a Current Report on Form 8-K with the SEC cryptically disclosing potential violations of the FCPA and noting that, as a result, Misonix may be subject to extensive damages, including fines, civil and criminal penalties,

equitable remedies, and injunctive relief. The Form 8-K stated:

> On September 27, 2016 and September 28, 2016, respectively, Misonix, Inc. (the "Company") contacted the Securities and Exchange Commission ("SEC") and the U.S. Department of Justice ("DOJ") to voluntarily inform both agencies that the Company may have had knowledge of certain business practices of the independent Chinese entity that distributes its products in China, which practices raise questions under the Foreign Corrupt Practices Act ("FCPA").

> The Audit Committee of the Board of Directors of the Company engaged outside counsel to conduct an internal investigation to review these and other matters. The internal investigation is ongoing. The Company has no current information derived from the investigation to date or otherwise to suggest that its previously reported financial statements and results are incorrect in any material respect.

> The Company intends to cooperate fully with the DOJ and SEC as the investigation continues. At this stage, the Company is unable to predict what, if any, action the DOJ or the SEC may take or what, if any, penalties or remedial measures these agencies may seek. Any determination that the Company's operations or activities are not in compliance with existing laws or regulations could result in the imposition of fines, civil and criminal penalties, equitable remedies, including profit disgorgement, and injunctive relief.

49.    On November 10, 2016, the Company filed a Form 8-K with the SEC reiterating that the filing of its 2016 Form 10-K would be delayed due to deficiencies in Misonix's internal control over financial reporting, and further revealed that the filing of the Company's Form 10-Q for the first quarter ended September 3, 2016, would also be delayed.  The same day, Misonix received a deficiency letter from The Nasdaq Stock Market LLC ("Nasdaq") stating that the Company was at risk of being delisted due to its failures to timely file its 2016 Form 10-K and first quarter Form 10-Q.

50.    On or about November 28, 2016, Nasdaq agreed to permit the continued listing of the Company's common stock but noted that Misonix would be delisted if it failed to file its delinquent 2016 Form 10-K and first quarter Form 10-Q on or before March 13, 2017.

51.    On February 9, 2017, Misonix finally filed the Company's long delayed 2016 Form 10-K. The 2016 Form 10-K revealed for the first time that, nearly a year prior, in April 2016, the Board learned of violations of Company policies and procedures and possible violations of laws and regulations involving defendant McManus and other Company personnel.  The 2016 Form

10-K further stated that while the Company's internal investigation did not identify any financial loss to the Company or material misstatements in the Company's financial statements, as a result of the investigation and undisclosed "related activities," Misonix was forced to incur approximately $1.5 million of professional fees as of December 31, 2016, and terminated the agreement with its former distributor in China, which was the Company's largest customer during the past three years.

52.     The 2016 Form 10-K also again confirmed that, despite the Individual Defendants' previous repeated representations to the contrary, Misonix's "disclosure controls and procedures were not effective, and were not operating at a reasonable assurance level, as of June 30, 2016." To make matters worse, the 2016 Form 10-K disclosed that Misonix also had an ineffective risk assessment process, ineffective ethical governance, ineffective controls and procedures to keep the Board apprised of illegal acts, an ineffective whistleblower process, and a "tone at the top" that failed to "demonstrate[] [a] commitment to integrity and ethical values." The 2016 Form 10-K further suggested that at least some undisclosed Board members were previously aware of "possible illegal acts and violations of Company policy," but failed to adequately and timely inform the full Board. The 2016 Form 10-K stated:

> The Company did not have an effective control environment, risk assessment process, information and communication process and monitoring activities. These matters related to ineffective ethical governance, ineffective governance controls, and ineffectively implemented policies and procedures. The aggregation of issues identified within each of these areas resulted in the conclusion that a material weakness existed with respect to the "tone at the top" and effectiveness of governance within the Company. Specifically:
>
> • *The Company failed to establish a tone at the top that demonstrated its commitment to integrity and ethical values.*
>
> • *The Company lacked effective controls and procedures to ensure that all members of management and Board members report to the full Board all possible illegal acts and violations of Company policy.*
>
> • The Company lacked effective procedures and controls to ensure that all reimbursement requests are handled in a manner consistent with the Board's authorizations and the Company's policies and procedures.

> • *The Company did not have effective information and communication and monitoring controls, including a robust whistleblower process*, relating to the timely identification and communication of issues among financial reporting personnel, management, the Board, and the independent registered public accounting firm to enable appropriate analysis, financial reporting, and disclosure of such transactions.

53.     The 2016 Form 10-K further suggested that defendant McManus was largely responsible for the wrongdoing, noting that his "replace[ment] [as CEO]" was an "essential step[] to establishing and maintaining strong and effective internal control over financial reporting and addressing the tone at the top concerns that contributed to the material weakness identified." Nonetheless, the 2016 Form 10-K disclosed that (presumably with the approval of the Board) the Company inexplicably released claims against defendant McManus and agreed to continue to pay his salary and medical premiums through June 30, 2017, while also extending the exercisability of previously granted and currently vested options to purchase shares of the Company's common stock through June 30, 2017.  In addition, Compensation Committee members, defendants Vizirgianakis, Gildea, Miner, and Minetti, further approved a $100,000 bonus to defendant McManus "based on performance in the fiscal 2015 year." The 2016 Form 10-K stated:

### Remediation of Material Weakness

The Company continues to work to strengthen our internal control over financial reporting. We are committed to ensuring that such controls are designed and operating effectively. Our Board and management take internal control over financial reporting and the integrity of the Company's financial statements seriously and believe that *the remediation steps described below, including with respect to personnel changes, were and are essential steps to establishing and maintaining strong and effective internal control over financial reporting and addressing the tone at the top concerns that contributed to the material weakness identified.* None of these remediation steps had taken place as of June 30, 2016. The following actions and plans will be or have been implemented during the fiscal 2017 year:

• *The Board replaced Mr. McManus* effective September 2, 2016 with our then interim and now current CEO, Stavros G. Vizirgianakis. In addition, on September 13, 2016, the Board appointed Joseph P. Dwyer as the Company's interim CFO, reporting to the Company's new CEO and the Audit Committee of the Board. On that date, Richard A. Zaremba ceased serving as the Company's Senior Vice President and CFO and was appointed Senior Vice President, Finance, while remaining as the Company's Secretary and Treasurer.

- 24 -

\* \* \*

*McManus Retirement Agreement*

On August 26, 2016, the Company and Mr. McManus entered into a Retirement Agreement and General Release (the "Retirement Agreement"). Pursuant to the Retirement Agreement, on September 2, 2016 Mr. McManus resigned as a Director and the Chairman of the Board of Directors of the Company and retired as President and Chief Executive Officer of the Company. Pursuant to the Retirement Agreement, which supersedes the McManus Agreement and letter agreements dated May 22, 2015, July 1, 2012 and July 1, 2012, respectively, *the Company agreed to (i) pay Mr. McManus' salary through June 30, 2017 at the current level; (ii) continue to pay premiums for Mr. McManus' and his dependents' coverage under the Company's medical, dental, vision, hospitalization, long term care and life insurance coverage through June 30, 2017 at the current levels upon timely election by Mr. McManus under the law informally known as COBRA; and (iii) extend the exercisability of previously granted and currently vested options to purchase shares of the Company's Common Stock through June 30, 2017. In addition, Mr. McManus had continued use of the vehicle provided him pursuant to the McManus Agreement through December 31, 2016.*

*The Retirement Agreement provides for customary releases by both the Company and Mr. McManus* as well as customary provisions concerning confidentiality, non-disparagement and cooperation.

\* \* \*

**Annual Bonus Plan Compensation**

*The Compensation Committee of the Board approves annual performance-based compensation.* The purpose of the annual bonus-based compensation is to motivate executive officers and key employees. Target bonuses, based upon recommendations from the Chief Executive Officer, are evaluated and approved by the Compensation Committee for all management employees other than the Chief Executive Officer. The bonus recommendations are derived from individual and Company performance but not based on a specific formula and are discretionary. *The Chief Executive Officer's bonus compensation is derived from the recommendation of the Compensation Committee based upon the Chief Executive Officer's performance and Company performance* but is not based on a specific formula and is discretionary.

During the fiscal year ended June 30, 2016, *bonuses based on performance in the fiscal 2015 year were paid to executive officers as follows: $100,000 to Mr. McManus,* $25,000 to Mr. Zaremba, $45,000 to Mr. Ludecker and $20,000 to Mr. Voic.

- 25 -

54.     On February 10, 2017, Misonix filed a Notification of Late Filing on Form 12b-25 with the SEC indicating that the Company will not be in a position to file its Quarterly Report on Form 10-Q for the fiscal second quarter ended December 31, 2016, within the five-day extension period provided in Rule 12b-25(b) promulgated under the Exchange Act.  The same day, the Company disclosed in a Current Report on Form 8-K that it was still in the process of preparing the delayed Form 10-Q for the first quarter ending September 30, 2016, and would also not be in a position to file the Form 10-Q for the second quarter ending December 31, 2016, within the five-day extension period provided in Rule 12b-25(b).  The same day, Misonix received another deficiency letter from Nasdaq as a result of the Company's inability to timely file the above noted Forms 10-Q.

55.     On March 13, 2017, Misonix finally filed the above-noted delayed Forms 10-Q.

56.     The SEC and DOJ investigations into potential FCPA violations at Misonix currently remain pending.

## REASONS THE STATEMENTS WERE IMPROPER

57.     The statements referenced above were each improper when made because they failed to disclose and misrepresented at least the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)     that the Company's internal controls over financial reporting were deficient, which resulted in unreliable financial reports;

(b)     the Company would not terminate defendant McManus for cause if appropriate;

(c)     the salaries paid to executives (such as defendant McManus) were not based on individual performance and the Company's performance; and

(d)     as a result of the foregoing, representations concerning Misonix's business, operations, and prospects were materially misleading and improper.

## DAMAGES TO MISONIX

58.     As a result of the Individual Defendants' improprieties, Misonix disseminated improper, public statements concerning the Company's inadequate internal controls.   These improper statements have devastated Misonix's credibility as reflected by the Company's over $8.8 million, or more than 18%, market capitalization loss.

59.     Misonix's performance issues also damaged its reputation within the business community and in the capital markets.   In addition to price, Misonix's current and potential customers consider a company's ability to implement adequate internal controls to ensure reported financial statements and results are correct.   Businesses are less likely to award contracts to companies that are uncertain about their own financial conditions.   Misonix's ability to raise equity capital or debt on favorable terms in the future is now impaired.   In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

60.     The Individual Defendants further wasted corporate assets by refusing to terminate defendant McManus for cause for violating Company policies and procedures.   Instead, the Individual Defendants wrongfully allowed defendant McManus to "retire," and further agreed to continue to pay his salary and medical premiums through June 30, 2017, while also extending the exercisability of previously granted and currently vested options to purchase shares of the Company's common stock through June 30, 2017.   In addition, Compensation Committee members, defendants Vizirgianakis, Gildea, Miner, and Minetti, wrongfully approved a $100,000 bonus to defendant McManus "based on performance in the fiscal 2015 year."

61.     Further, as a direct and proximate result of the Individual Defendants' actions,

Misonix has expended, and will continue to expend, significant sums of money.   Such expenditures include, but are not limited to:

        (a)    costs incurred from defending and paying any settlement in the Securities Class Action for violations of federal securities laws;

        (b)    costs incurred from investigating the internal control weaknesses and business practices that may potentially violate the FCPA; and

        (c)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to Misonix.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

62.    Plaintiff brings this action derivatively in the right and for the benefit of Misonix to redress injuries suffered, and to be suffered, by Misonix as a direct result of violation of securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Misonix is named as a nominal defendant solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

63.    Plaintiff will adequately and fairly represent the interests of Misonix in enforcing and prosecuting its rights.

64.    Plaintiff was a stockholder of Misonix at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Misonix stockholder.

65.    The current Board of Misonix consists of the following five individuals: defendants Vizirgianakis, Gildea, Miner, McBrayer, and Patton.   Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Vizirgianakis, Gildea, Miner, McBrayer, and Patton Face a Substantial Likelihood of Liability for Their Misconduct**

66.     As alleged above, Director Defendants, defendants Vizirgianakis, Gildea, Miner, McBrayer, and Patton, violated section 14(a) of the Exchange Act by at least negligently making the misstatements and omissions in the Proxy.  These defendants also breached their fiduciary duties of loyalty by causing or allowing Misonix to make improper statements in the Company's press releases and SEC filings regarding the Company's deficient internal controls.  Accordingly, demand is excused because a majority of the Board faces a substantial likelihood of liability.

67.     Defendants Gildea, Miner, and McBrayer, as members of the Audit Committee comprising a majority of the Board, reviewed and approved the improper statements and earnings guidance.  The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements.  Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls.  Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public.  Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements.  In addition, the Audit Committee was required to "establish and oversee procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and the confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters, and "oversee the Company's policies, procedures and programs designed to promote and monitor legal, ethical and regulatory compliance"  The Company has admitted, however, that Misonix lacked a proper "tone at the top" that failed to "demonstrate[] [a] commitment to integrity and ethical values," and the Company "did not have effective information and communication and

- 29 -

monitoring controls, including a robust whistleblower process." Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

68.     Defendants Vizirgianakis, Gildea, Miner, McBrayer, and Patton will not initial litigation against defendant McManus, despite the fact that since at least April 2016, five months before defendant McManus "retired," the Board knew of significant improprieties at Misonix involving defendant McManus including with respect to "violations of Company policies and procedures and possible violations of laws and regulations." Indeed, despite the Board's admission that replacing defendant McManus as CEO was an "essential step[] to establishing and maintaining strong and effective internal control over financial reporting and addressing the tone at the top concerns that contributed to the material weakness identified," the Board caused or allowed the Company to indemnify defendant McManus and continue to pay his salary and medical premiums through June 30, 2017. Misonix has also admitted that "[t]he Company lacked effective controls and procedures to ensure that all members of management and Board members report to the full Board all possible illegal acts and violations of Company policy." This suggests that at least some Board members knew of the illegal acts at Misonix for some time before the Board was apprised in April 2016, yet failed to take timely and appropriate action, including by failing to even inform the full Board of the known wrongdoing. Worse, after the entire Board indisputably was informed of wrongdoing including with respect to defendant McManus, as members of the Compensation Committee, defendants Vizirgianakis, Gildea, Miner, and Minetti thereafter approved a $100,000 bonus to defendant McManus "based on performance in the fiscal 2015 year." To date, the Board has utterly failed to bring litigation against any of those responsible for the breakdown of the

Company's controls, improper statements, violations of Company policies and procedures, and possible violations of laws and regulations. Plaintiff now seeks to pursue an action based on these same instances of wrongdoing. As Vice Chancellor Stephen P. Lamb explained, "it would be odd if Delaware law required a stockholder to make demand on the board of directors before suing on those very same theories of recovery." *Conrad v. Blank*, 940 A.2d 28, 38 (Del. Ch. 2007). Due to the Board's inaction in the face of this identified wrongdoing, demand upon the Board is excused.

69.    Plaintiff has not made any demand on the other stockholders of Misonix to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    Misonix is a publicly held company with over nine million shares outstanding as of April 28, 2017, and thousands of stockholders;

(b)    making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

70.    making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

**Against Defendants McManus, Vizirgianakis, Gildea, Miner, McBrayer, Patton, and Minetti for Violation of Section 14(a) of the Exchange Act**

71.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

72.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of Director Defendants, defendants McManus, Vizirgianakis, Gildea, Miner, McBrayer, Patton, and Minetti. The section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud.

Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the non-fraud claims.

73.     Defendants McManus, Vizirgianakis, Gildea, Miner, McBrayer, Patton, and Minetti negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the Proxy.  The Proxy contained a proposal to Misonix's stockholders urging stockholders to approve executive compensation.  The Proxy, however, misrepresented and failed to disclose that the Company's internal controls were inadequate, Misonix would not actually terminate employees for cause where appropriate, and the Company's executive compensation structure was not actually intended to: (i) motivate and reward employees of outstanding ability; (ii) link salaries to individual and corporate performance; (iii) align employee interests with those of the Company's stockholders; or (iv) increase stockholder value.  By reasons of the conduct alleged herein, defendants McManus, Vizirgianakis, Gildea, Miner, McBrayer, Patton, and Minetti violated section 14(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, Misonix misled and/or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding Misonix's recommendation approve certain executive compensation.

74.     The misleading information contained in the Proxy was material to Misonix's stockholders in determining whether or not to approve certain executive compensation.  The proxy solicitation process in connection with the Proxy was an essential link in the approval of the executive compensation plan.

75.     Plaintiff, on behalf of Misonix, thereby seeks relief for damages inflicted upon the Company based upon the misleading Proxy in connection with the improper approval of executive compensation.

## <u>COUNT II</u>

### Against the Individual Defendants for Breach of Fiduciary Duty

76.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

77.     The Individual Defendants owed and owe Misonix fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Misonix the highest obligation of good faith, fair dealing, loyalty, and due care.

78.     The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Misonix, and/or consciously failing to prevent to Company from engaging in the unlawful acts complained of herein.

79.     The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.   The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) the Company's internal controls were deficient; (ii) the Individual Defendants representations concerning Misonix's business, operations, and prospects were materially misleading; (iii) the "tone at the top" at Misonix was improper; and (iv) the CEO and other personnel violated Company policies and procedures, laws, and/or regulations.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

80.     The Director Defendants, as directors of the Company, owed Misonix the highest duty of loyalty.  These defendants breached their duty of loyalty by knowingly or recklessly permitting the Company to operate with deficient internal controls. The Director Defendants knew or were reckless in not knowing that: (i) the Company's internal controls were deficient; (ii) the

- 33 -

Individual Defendants' representations concerning Misonix's business, operations, and prospects were materially misleading; (iii) the "tone at the top" at Misonix was improper; and (iv) the CEO and other personnel violated Company policies and procedures, laws, and/or regulations.

81.     The Audit Committee Defendants, defendants Gildea, Miner, and McBrayer, breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants completely and utterly failed in their duty of oversight, and defendants Gildea, Miner, and McBrayer failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

82.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Misonix has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

83.     Plaintiff, on behalf of Misonix, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Waste of Corporate Assets

84.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

85.     As a result of the wrong detailed herein and by failing to conduct proper supervision, the Individual Defendants have caused Misonix to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

86. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

87. Plaintiff, on behalf of Misonix, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

88. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

89. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Misonix. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Misonix.

90. Plaintiff, as a stockholder and representative of Misonix, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

91. Plaintiff, on behalf of Misonix, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Misonix, demands judgment as follows:

A. Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' violation of securities law, breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B. Directing Misonix to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Misonix and its

stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following Corporate Governance Policies:

       1.      a proposal to strengthen the Company's controls over financial reporting;

       2.      a proposal to strengthen Misonix's oversight of its disclosure procedures;

       3.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

       4.      a provision to permit the stockholders of Misonix to nominate at least three candidates for election to the Board.

       C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Misonix has an effective remedy;

       D.      Awarding to Misonix restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

       E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

       F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: June 6, 2017

LAW OFFICE OF THOMAS G. AMON

THOMAS G. AMON

733 3rd Avenue, 15th Floor
New York, NY 10017
Telephone: (212) 810-2430
E-mail: tamon@amonlaw.com

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
CRAIG W. SMITH
SHANE P. SANDERS
600 B Street, Suite 1900
SAN DIEGO, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
csmith@robbinsarroyo.com
ssanders@robbinsarroyo.com

THE LAW OFFICES OF NICHOLAS
KOLUNCICH III, LLC
NICHOLAS KOLUNCICH III
LISA YOUNGNER
500 Marquette Avenue NW, Suite 1200
Albuquerque, NM 87102
Telephone: (505) 881-2228
Facsimile: (505) 881-4288
Email: nkoluncich@newmexicoclassactions.com
lyoungner@newmexicoclassactions.com

Attorneys for Plaintiff

1167772

- 37 -

## VERIFICATION

I, Irving Feldbaum, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 6/2/17

IRVING FELDBAUM