**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE MISONIX, INC. STOCKHOLDER DERIVATIVE LITIGATION | Lead Case No. 2:17-cv-03385-ADS-AYS |
| | (Consolidated with No. 2:17-cv-03657–ADS-GRB) |
| This Document Relates To: | Honorable Arthur D. Spatt |
| ALL DERIVATIVE ACTIONS | Courtroom 1020 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF DERIVATIVE SETTLEMENT**

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     OVERVIEW OF THE LITIGATION .................................................................2

        A.      The Derivative Actions ...............................................................................2

        B.      Settlement Negotiations ..............................................................................3

        C.      Preliminary Approval ..................................................................................4

III.    THE SETTLEMENT TERMS................................................................................5

IV.     THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE ..............8

        A.      Legal Standards Governing Final Approval .............................................8

        B.      The Settlement Merits a Presumption of Fairness Because It Is the Product
                of Arm's-Length Negotiations by Experienced and Well-Informed Counsel.........9

        C.      Relevant *Grinnell* Factors Confirm the Fairness, Reasonableness, and
                Adequacy of the Settlement ......................................................................12

                1.      The Settlement Confers Substantial Benefits on Misonix .......................12

                2.      Continued Litigation Would Be Risky, Costly, and Time-
                        Consuming ......................................................................................13

                3.      The Reaction of Shareholders Further Supports Settlement
                        Approval ........................................................................................16

V.      THE NEGOTIATED FEE AND EXPENSE AMOUNT IS REASONABLE ...............17

        A.      Legal Standards Governing Attorneys' Fees and Expenses....................18

        B.      The *Goldberger* Factors Confirm the Reasonableness of the Negotiated
                Fee and Expense Amount ..........................................................................20

                1.      The Fee and Expense Amount Is Reasonable in Light of the
                        Benefits Conferred .........................................................................20

                2.      The Skill Demonstrated by Plaintiffs' Counsel Supports the Agreed
                        Fee and Expense Amount ...............................................................21

                3.      The Contingency Risk Borne by Plaintiffs' Counsel Supports the
                        Agreed Fee and Expense Amount...................................................22

4.    The Substantial Time and Expense Devoted to the Litigation
      Supports the Agreed Fee and Expense Amount ........................................22

5.    Public Policy Supports the Agreed Fee and Expense Amount .................24

C.    The Service Awards to Plaintiffs Are Reasonable..................................................24

VI.   CONCLUSION...........................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                       **PAGE(S)**

*Auerbach v. Bennett,*
393 N.E.2d 994 (1979).............................................................................15

*Bateman Eichler, Hill Richards, Inc. v. Berner,*
472 U.S. 299 (1985)................................................................................22

*Bell Atl. Corp. v. Bolger,*
2 F.3d 1304 (3d Cir. 1993)......................................................................12

*Berkey Photo, Inc. v. Eastman Kodak Co.,*
603 F.2d 263 (2d Cir. 1979)....................................................................16

*Bozak v. FedEx Ground Package Sys., Inc.,*
2014 WL 3778211 (D. Conn. July 31, 2014) ..........................................23

*Brooks v. Am. Exp. Indus., Inc.,*
1977 U.S. Dist. LEXIS 17313 (S.D.N.Y. Feb. 17, 1977)........................11

*City of Detroit v. Grinnell Corp.,*
495 F.2d 448 (2d Cir. 1974)........................................................... *passim*

*Clark v. Ecolab Inc.,*
2010 WL 1948198 (S.D.N.Y. May 11, 2010) ............................................9

*Cohen v. Beneficial Indus. Loan Corp.,*
337 U.S. 541 (1949)................................................................................24

*Cohn v. Nelson,*
375 F. Supp. 2d 844 (E.D. Mo. 2005).................................................14, 22

*D'Amato v. Deutsche Bank,*
236 F.3d 78 (2d Cir. 2001)......................................................................12

*Daubert v. Merrell Dow Pharm., Inc.,*
509 U.S. 579 (1993)................................................................................16

*Espinoza v. Dimon,*
790 F.3d 125 (2d Cir. 2015)....................................................................15

*Goldberger v. Integrated Res., Inc.,*
209 F.3d 43 (2d Cir. 2000)...................................................9, 18, 22, 23

*Grant v. Bethlehem Steel Corp.,*
823 F.2d 20 (2d Cir. 1987)......................................................................16

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983)................................................................................19

*In re Advanced Battery Techs., Inc. Secs. Litig.*,
    298 F.R.D. 171 (S.D.N.Y. 2014) ...........................................................9

*In re AOL Time Warner S'holder Derivative Litig.*,
    2006 WL 2572114 (S.D.N.Y. Sept. 6, 2006)...................................8, 12, 14, 16

*In re AOL Time Warner S'holder Derivative Litig.*,
    2010 WL 363113 (S.D.N.Y. Feb. 1, 2010)............................................24

*In re AOL Time Warner, Inc.*,
    2006 WL 903236 (S.D.N.Y. Apr. 6, 2006)............................................17

*In re Apollo Grp., Inc. Sec. Litig.*,
    2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd & remanded*, 2010 WL
    5927988 (9th Cir. June 23, 2010) ........................................................16

*In re Ashanti Goldfields Sec. Litig.*,
    2005 WL 3050284 (E.D.N.Y. Nov. 15, 2005)........................................21

*In re Austrian & German Bank Holocaust Litig.*,
    80 F. Supp. 2d 164 (S.D.N.Y. 2000).....................................................9

*In re Bear Stearns Companies Sec., Derivative & ERISA Litig.*,
    909 F. Supp. 2d 259 (S.D.N.Y. 2012)...................................................19

*In re Caremark Int'l Inc. Derivative Litig.*,
    698 A.2d 959 (Del. Ch. 1996)...............................................................14

*In re Cendant Corp. Derivative Action Litig.*,
    232 F. Supp. 2d 327 (D.N.J. 2002) .......................................................25

*In re Citigroup Inc. Bond Litig.*,
    296 F.R.D. 147 (S.D.N.Y. 2013) .........................................................17

*In re Comverse Tech., Inc. Sec. Litig.*,
    2010 WL 2653354 (E.D.N.Y. June 24, 2010) ......................................23

*In re Delphi Corp. Sec., Derivative & "ERISA" Litig.*,
    248 F.R.D. 483 (E.D. Mich. 2008) .......................................................17

*In re Educ. Testing Serv. Praxis Principles of Learning & Teaching, Grades 7-12*
    *Litig.*,
    447 F. Supp. 2d 612 (E.D. La. 2006) ...................................................10

*In re Elan Sec. Litig.*,
    385 F. Supp. 2d 363 (S.D.N.Y. 2005).............................................................................9

*In re Lloyd's Am. Tr. Fund Litig.*,
    2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002).......................................................15, 24

*In re Marsh ERISA Litig.*,
    265 F.R.D. 128 (S.D.N.Y. 2010) ..................................................................................25

*In re Mego Fin. Corp. Sec. Litig.*,
    213 F.3d 454 (9th Cir. 2000) ........................................................................................10

*In re Metro. Life Derivative Litig.*,
    935 F. Supp. 286 (S.D.N.Y. 1996).........................................................................8, 9, 14, 15

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) ..................................................................................24

*In re NeuStar, Inc. Sec. Litig.*,
    2015 U.S. Dist. LEXIS 165320 (E.D. Va. Dec. 8, 2015) ..................................................10

*In re Omnicom Grp. Inc. S'holder Derivative. Litig.*,
    43 A.D.3d 766 (1st Dep't 2007)....................................................................................14

*In re Omnivision Techs., Inc.*,
    559 F. Supp. 2d 1036 (N.D. Cal. 2008) .......................................................................17

*In re Oracle Sec. Litig.*,
    852 F. Supp. 1437 (N.D. Cal. 1994) ......................................................................17, 20

*In re Pac. Enters. Sec. Litig.*,
    47 F.3d 373 (9th Cir. 1995) ..........................................................................................14

*In re PaineWebber Ltd. P'ships Litig.*,
    171 F.R.D. 104 (S.D.N.Y.), *aff'd*, 117 F.3d 721 (2d Cir. 1997) .........................................9

*In re Pfizer Inc., S'holder Derivative Litig.*,
    780 F. Supp. 2d 336 (S.D.N.Y. 2011)...........................................................................13

*In re Presidential Life Sec.*,
    857 F. Supp. 331 (S.D.N.Y. 1994)................................................................................25

*In re Schering-Plough Corp. S'holders Derivative Litig.*,
    2008 WL 185809 (D.N.J. Jan. 14, 2008).......................................................................20

*In re Schering-Plough/Merck Merger Litig.*,
    2010 WL 1257722 (D.N.J. Mar. 26, 2010).....................................................................19

*In re Telik, Inc. Sec. Litig.*,
    576 F. Supp. 2d 570 (S.D.N.Y. 2008)................................................................9

*In re Walt Disney Co. Derivative Litig.*,
    907 A.2d 693 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006) .........................12

*In re Warner Commc'ns Sec. Litig.*,
    618 F. Supp. 735 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986) ............................21

*In re WorldCom, Inc. Sec. Litig.*,
    388 F. Supp. 2d 319 (S.D.N.Y. 2005)................................................................24

*In re Xcel Energy, Inc. Sec. Derivative & "ERISA" Litig.*,
    364 F. Supp. 2d 980 (D. Minn. 2005)................................................................25

*Ingram v. The Coca-Cola Co.*,
    200 F.R.D. 685 (N.D. Ga. 2001)........................................................................18

*Int'l Distrib. Ctrs, Inc. v. Walsh Trucking Co., Inc.*,
    62 B.R. 723 (S.D.N.Y. 1986)............................................................................21

*Kamen v. Kemper Fin. Servs., Inc.*,
    500 U.S. 90 (1991).............................................................................................24

*Levy v. Huszagh*,
    2012 WL 4512038 (E.D.N.Y. Sept. 28, 2012) .................................................15

*Lewis v. Newman*,
    59 F.R.D. 525 (S.D.N.Y. 1973) .......................................................................14

*Lizondro–Garcia v. Kefi LLC*,
    2014 WL 4996248 (S.D.N.Y. Oct. 7, 2014) ....................................................25

*Maher v. Zapata Corp.*,
    714 F.2d 436 (5th Cir. 1983) .......................................................................13, 20

*McDaniel v. Cty. of Schenectady*,
    595 F.3d 411 (2d Cir. 2010)..............................................................................18

*Mills v. Elec. Auto-Lite Co.*,
    396 U.S. 375 (1970).....................................................................12, 13, 17, 20

*Republic Nat'l Life Ins. Co. v. Beasley*,
    73 F.R.D. 658 (S.D.N.Y. 1977) .........................................................................8

*Sauby v. City of Fargo*,
    2009 WL 2168942 (D.N.D. July 16, 2009) ......................................................25

*Schimmel v. Goldman*,
    57 F.R.D. 481 (S.D.N.Y. 1973) ............................................................................8

*Shapiro v. JPMorgan Chase & Co.*,
    2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) ..................................................18

*St. Clair Shores Gen. Emps. Ret. Sys. v. Eibeler*,
    2008 U.S. Dist. LEXIS 57546 (S.D.N.Y. July 30, 2008) .................................15

*Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassinni*,
    258 F. Supp. 2d 254 (S.D.N.Y. 2003).......................................................8, 9, 17

*Surowitz v. Hilton Hotels Corp.*,
    383 U.S. 363 (1966).........................................................................................24

*Tandycrafts, Inc. v. Initio Partners*,
    562 A.2d 1162 (Del. 1989) ..............................................................................17

*Unite Nat'l Ret. Fund v. Watts*,
    2005 WL 2877899 (D.N.J. Oct. 28, 2005)........................................................21

*Velez v. Novartis Pharm. Corp.*,
    2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010)......................................13, 16, 23

*W. Va. v. Chas. Pfizer & Co.*,
    314 F. Supp. 710 (S.D.N.Y. 1970), *aff'd*, 440 F.2d 1079 (2d Cir. 1971) .........14

*Wal-Mart Stores v. Visa U.S.A. Inc.*,
    396 F.3d 96 (2d Cir. 2005)...............................................................................23

*Wandel v. Dimon*,
    23 N.Y.S. 3d 200 (App. Div.—1st Dep't 2016)...............................................14

*Weinberger v. Kendrick*,
    698 F.2d 61 (2d. Cir. 1982), *cert. denied*, 464 U.S. 818 (1983)......................8, 9

## STATUTES, RULES & OTHER AUTHORITIES

N.Y. Bus. Corp. Law §402(b)............................................................................15

Lead Plaintiffs Irving Feldbaum and Michael Rubin ("Plaintiffs"), by and through their undersigned counsel ("Plaintiffs' Counsel"), respectfully submit this Motion for Final Approval of Derivative Settlement. All capitalized terms that are not otherwise defined shall have the same definitions as set forth in the Stipulation of Settlement dated May 3, 2019, and filed on May 7, 2019 ("Stipulation" or "Stip.").

## I.   INTRODUCTION

The Settlement presented for final approval would resolve claims brought derivatively on behalf of Misonix, Inc. ("Misonix" or the "Company") arising out of alleged violations of the Foreign Corrupt Practices Act ("FCPA") and an allegedly inadequate system of internal controls at the Company. If approved, the Settlement would address the alleged wrongdoing through a series of corporate governance and oversight reforms designed to prevent recurrence of the same or similar wrongdoing through improved structures, procedures, and internal controls. Misonix will implement and maintain for a period of at least six (6) years a comprehensive set of FCPA compliance-related policies and procedures (and other enhancements) that will help to ensure the Company's compliance with the FCPA and other anti-corruption laws and regulations (the "Reforms"). Weighed against the substantial risks, costs and delays entailed in attempting to improve upon this result through further litigation, the Settlement's guarantee of substantial benefits in the form of the strong corporate governance and enhanced FCPA compliance-related processes, policies, and procedures embodied in the Reforms is fair, reasonable and adequate.

The substantive consideration for the Settlement was determined in extensive, arm's-length negotiations conducted by experienced and well-informed counsel. The parties' agreement on the Fee and Expense Amount to compensate Plaintiffs' Counsel for their efforts and the risks they assumed in prosecuting the claims on a fully contingent basis and securing the substantial benefits of the Settlement was also the product of arm's-length negotiations, assisted by an experienced

private mediator.  Misonix's independent, non-defendant directors, along with the entire Misonix Board of Directors (the "Board"), agree that the Settlement confers substantial benefits on Misonix and its shareholders, and have approved the Settlement and each of its terms as serving the best interests of the Company.

Accordingly, Plaintiffs respectfully submit that the Settlement is a sound resolution of this complex derivative litigation and merits final approval in all respects.

## II.   OVERVIEW OF THE LITIGATION

### A.   The Derivative Actions

On August 26, 2016, Misonix announced that its Chairman of the Board had resigned from that position and retired from his positions as the President and Chief Executive Officer ("CEO"). The Company subsequently disclosed that internal control deficiencies prevented the timely filing with the U.S. Securities and Exchange Commission (the "SEC") of Misonix's Annual Report on Form 10-K (the "2016 10-K").  Declaration of Shane P. Sanders in Support of Plaintiffs' Motion for Final Approval of Derivative Settlement ("Sanders Decl."), ¶6.

On September 28, 2016, Misonix filed with the SEC a Current Report on Form 8-K, disclosing that the Company had voluntarily contacted the SEC and U.S. Department of Justice regarding business practices of the distributor responsible for distributing its products in China that raised questions under the FCPA.  *Id*., ¶7.

On February 9, 2017, Misonix filed the 2016 10-K, which disclosed that the Company's Board had been informed by management of potential violations of Company policies and possible violations of FCPA-related laws and regulations involving Misonix's former Chairman/CEO and other Company personnel.  Sanders Decl., ¶8.  The 2016 10-K further disclosed that an Audit Committee investigation found "material weaknesses in internal control over [] financial

reporting" and that "disclosure controls and procedures were not effective, and were not operating at a reasonable assurance level, as of June 30, 2016." *Id.*

On June 6 and June 16, 2017, shareholder plaintiffs Irving Feldbaum and Michael Rubin, respectively, filed verified complaints asserting claims derivatively on behalf of Misonix against the Individual Defendants for: (i) violation of section 14(a) of the Securities Exchange Act of 1934 and SEC Rule 14a-9 promulgated thereunder; (ii) breach of fiduciary duty; (iii) gross mismanagement; (iv) unjust enrichment; and (v) waste of corporate assets (the Defendants deny each and every claim alleged by Plaintiffs). Sanders Decl., ¶9. The complaints sought compensation for Misonix for damages proximately caused by the alleged breaches of duty, and to cause the Company to implement material enhancements to its internal controls and corporate governance practices, particularly with respect to FCPA compliance. *Id.*

On July 21, 2017, the Court entered an Order consolidating the two derivative cases under the caption, *In re Misonix, Inc. Stockholder Derivative Litigation*, Lead Case No. 2:17-cv-03385-ADS-AYS (ECF No. 26), and appointing Robbins Arroyo LLP ("Robbins Arroyo") and WeissLaw LLP ("WeissLaw") as co-lead counsel for Plaintiffs. Sanders Decl., ¶10.

### B.     Settlement Negotiations

The Settling Parties began exploring the possibility of an early resolution of the Action in August of 2017. Sanders Decl., ¶11. Over the course of the next five months, the Settling Parties engaged in substantive, hard-fought negotiations. *Id.* In order to facilitate the Settling Parties' discussions, Misonix provided Plaintiffs with nonpublic documents reflecting analyses of the Company's prior and existing internal controls; certain actions being taken by the Company with respect to the FCPA issues raised in this Action; and the status of the Company's efforts to evaluate and enhance its internal controls. *Id.* The Settling Parties participated in numerous verbal and written exchanges of information, proposals and counter-proposals. *Id.*

On April 6, 2018, the Settling Parties agreed in principle on a set of corporate governance and internal control reforms that will significantly enhance and strengthen the Company's internal controls relating to FCPA compliance, Board oversight of operations and compliance, and its corporate governance, overall. *See* Stipulation, Ex. 1; Sanders Decl., ¶12. In the event the Settlement is approved, Misonix shall maintain the Reforms for at least six (6) years. *Id.*

After the Settling Parties agreed in principle on the substantive consideration for the Settlement, they turned to the question of the amount of attorneys' fees and expenses to be paid to Plaintiffs' Counsel in consideration for their efforts in prosecuting the derivative action on a fully contingent basis and securing the substantial benefits conferred through the Reforms. Sanders Decl., ¶13. The Company and its insurers were represented by counsel in these discussions. *Id.* The negotiations were arms'-length and hard fought. *Id.* The Settling Parties proved unable to reach an agreement on their own, and sought the assistance of Michelle Yoshida, a mediator with extensive experience in derivative and other shareholder litigation. *Id.* After months of mediated negotiations, Ms. Yoshida made a "mediator's recommendation" of $500,000 in attorneys' fees and expenses to be paid to Plaintiffs' Counsel, subject to Court approval. *Id.* All parties accepted the mediator's recommendation. *Id.*

On July 16, 2018, Plaintiffs' Counsel informed the Court that the parties had reached a settlement in principle and requested that the Court stay all deadlines while the parties completed their negotiations regarding documentation of the Settlement. Sanders Decl., ¶14. On July 17, 2018, the Court entered an Order staying all proceedings (ECF No. 49). *Id.* Plaintiffs believe that a settlement on the terms and on the conditions set forth in the Stipulation is fair, reasonable, and adequate, and serves the best interests of Misonix and its shareholders. *Id.*; Stip., §§II, III, IV.

## C. Preliminary Approval

On May 9, 2019, after considering Plaintiffs' preliminary approval briefing, this Court

granted preliminary approval of the Settlement, authorized notice of the Settlement to Current Misonix Shareholders, and set July 26, 2019 as the hearing date for final approval of the Settlement. Sanders Decl., ¶16. Notice was timely disseminated to Current Misonix Shareholders in accordance with the Preliminary Approval Order. *Id*.; Declaration of Jorgeanne Cabuhat Regarding Posting of Notice of Proposed Settlement of Derivative Action, ¶2 (ECF No. 54); Declaration of Christina Leroy Regarding Posting of Notice of Proposed Settlement of Derivative Action, ¶2 (ECF No. 55); Declaration of John Williams Regarding Posting and Publication of Notice Regarding Settlement ("Williams Decl.") (ECF No. 56), ¶¶2-5. The Notice directed that any objections to the Settlement be filed by July 16, 2019. Sanders Decl., ¶16. As of July 12, 2019, the date of this filing, to Plaintiffs' Counsel's knowledge, no Misonix shareholder has objected to the Settlement. *Id.*

## III.    THE SETTLEMENT TERMS

The substantive consideration secured by Plaintiffs in exchange for general releases of the Individual Defendants is an outstanding result for Misonix and its shareholders. In the event the Settlement is approved, Misonix will, within 120 days of final settlement approval, implement the following Reforms and maintain them for not less than six (6) years:

- Implementation of several new FCPA compliance-related oversight and reporting controls and responsibilities for Misonix's Compliance Officer, the Company's Audit Committee and Compliance Committee, including: the requirement that the Compliance Officer update the Audit Committee at least annually regarding the Company's FCPA compliance policies, efforts, remedial measures, as well as any identified potential violations, internal control weaknesses, and related risk exposures; the requirement that the Compliance Officer provide relevant updates and written summaries to the Audit Committee on significant FCPA-related issues and remedial steps, investigations, or reviews of potential violations of law; and the requirement that the Audit Committee report, at least bi-annually, to the Board with respect to Misonix's compliance with legal or regulatory requirements;

- Adoption of numerous enhancements to the Company's FCPA-compliance policies (such as the Code and the Anti-Bribery/Anti-Corruption Policy), including by

requiring that: the policies apply to all positions at Misonix, regardless of tenure or location, including Misonix's Board members, executive officers, and employees throughout the world; the policies also apply to individuals or entities acting on behalf of Misonix and Misonix's international distributors; the policies shall be posted as a worldwide policy on Misonix's intranet, and any changes or modifications to the policies shall be appropriately communicated to employees via the intranet or other means; employees shall periodically complete a certification of their understanding of their obligations and agreement to comply with Misonix's Code of Conduct; the policies include a statement expressing a prohibition against any form of bribery or corruption, which shall include the giving, promising, offering, or accepting anything of value to improperly influence a decision affecting Misonix's business, with no materiality or *de minimis* exceptions; the policies must include directions on a reporting process to be followed if any Misonix employee has any reason to believe that any action or proposed course of action does not comply with anti-corruption laws, or any other relevant Misonix policy or procedure; and the Compliance Officer and the Compliance Committee shall, at least bi-annually, review the relevant policies and report to the Board regarding any necessary improvements to the effectiveness of the policies;

- Implementation of an FCPA Testing Program to regularly monitor and evaluate a risk-based sample of business interactions in country environments posing relatively high FCPA compliance risks;

- Establishing requirements that will ensure that newly-acquired businesses quickly implement effective anti-corruption policies and procedures subject to Misonix's internal controls regime, and timely training of appropriate employees regarding anti-corruption laws and regulations, and Misonix's compliance policies and procedures;

- Establishing FCPA compliance as a factor in the Compensation Committee's decision-making with respect to performance-based or incentive compensation, awards;

- Adoption of policies and charter provisions that require the Audit Committee to review with management and Misonix's independent auditors the effectiveness and adequacy of the Company's internal reporting procedures and controls, including FCPA compliance;

- Implementation and maintenance of mandatory training in compliance with the FCPA and related policies for all Misonix officers; and

- Adoption of the requirement that the Board meet at least four times per year.  Stip., Ex. 1, §II.

In addition, Misonix's Board acknowledges that the Action was a material factor in the Company's decision to implement the following enhancements to its controls environment during the pendency of the Action, which, as part of the Settlement, the Board has agreed to maintain for at least six (6) years following final approval:

- The creation of a new "Compliance Officer" position;

- The reconstitution of Misonix's Compliance Committee to include the entire senior management team, appointing the Compliance Officer as Chair and the sales and marketing officers as non-voting members;

- The development of a "Distributor Screening Process/Policy" regarding international distributors;

- The hiring of an internal auditor adviser to help Misonix update its policies and procedures;

- The retention of a third party expert consulting firm to assist management with the review of the Company's quarterly and annual tax provisions and tax footnotes in financial reporting;

- Revisions to Misonix's Code of Business Conduct and Ethics, including: new sections addressing the Company's policies on "Anti-Bribery and Corruption" (which, among other things, summarizes the FCPA as well as certain other anti-corruption statutes), "Business Meals and Other Courtesies," and "Insider Trading"; summaries of other relevant statutes, including the Anti-Kickback Statute, the False Claims Act, and anti-trust laws; the Company's "Conflicts of Interest" policy; the Company's "Harassment" policy; and a new section called "Outcomes of Reporting a Concern" section, which addresses the process for whistleblowers to report concerns via the Company's whistleblower hotline;

- Enhanced substance and frequency of communications and employee training regarding the ethical values of the Company; and

- Amendments to the Charters for the Audit Committee, Nominating and Governance Committee and Compensation Committee, including (among other things) enhanced independence requirements and oversight responsibilities for the Audit Committee and prohibitions on the ability of the committees to delegate its authorities.  Stip., Ex. 1, §I.C.

The Misonix Board also acknowledges that the Action was a factor in certain other remedial measures that have been implemented or are in the process of being implemented,

including, but not limited to: (i) certain personnel changes made since the Action was commenced, including the resignation of the Company's then-Senior Vice President, Treasurer, and Secretary and the appointment of a new Chief Financial Officer; (ii) the termination of Misonix's agreement with its former independent distributor of the Company's products in China; and (iii) amendments of distribution agreements with Misonix's international distributors to ensure compliance with the FCPA and other applicable laws.  Stip., Ex. 1, §§I.A.-B.

Misonix and the Individual Defendants acknowledge and agree that the Reforms are significant and confer substantial benefits upon Misonix and its shareholders.  Stip., ¶2.1.

## IV.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

### A.    Legal Standards Governing Final Approval

The determination as to whether a settlement should be approved is left to the sound discretion of this Court.  *See Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassinni*, 258 F. Supp. 2d 254, 257 (S.D.N.Y. 2003).  "'The central question … is whether the compromise is fair, reasonable and adequate.'"  *In re Metro. Life Derivative Litig.*, 935 F. Supp. 286, 291 (S.D.N.Y. 1996) (omission in original) (quoting *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d. Cir. 1982), *cert. denied*, 464 U.S. 818 (1983)).  Final approval is warranted if "the compromise 'fairly and adequately serves the interests of the corporation on whose behalf the derivative action was instituted.'"  *In re AOL Time Warner S'holder Derivative Litig.*, 2006 WL 2572114, at *2 (S.D.N.Y. Sept. 6, 2006).

Public policy strongly favors settlements of complex litigation, and in particular of derivative litigation, because it is "'notoriously difficult and unpredictable.'"  *Id.* at *3; *see also Republic Nat'l Life Ins. Co. v. Beasley*, 73 F.R.D. 658, 667 (S.D.N.Y. 1977) (same); *Schimmel v. Goldman*, 57 F.R.D. 481, 487 (S.D.N.Y. 1973) (same).  Additional "weighty justifications" include

"the reduction of litigation and related expenses." *Weinberger*, 698 F.2d at 73.

The Court is not to try the issues or decide the merits of the case. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974) (hereinafter, "*Grinnell*"), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000) ("settlement hearing must not be turned into a trial or a rehearsal of the trial"). To the contrary, there is a "strong initial presumption" that a proposed settlement negotiated at arm's-length is fair and reasonable. *Strougo*, 258 F. Supp. 2d at 257. Here, the adversarial negotiation process and the substantive terms of the Settlement support a finding that it is fair, reasonable, and adequate.

### B. The Settlement Merits a Presumption of Fairness Because It Is the Product of Arm's-Length Negotiations by Experienced and Well-Informed Counsel

In determining whether a settlement is fair, courts focus on whether the settlement was a result of good faith bargaining at arm's-length without collusion. *Weinberger*, 698 F.2d at 74. "[A] strong presumption of fairness attaches" to settlements negotiated at arm's-length by experienced and well-informed counsel. *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 576 (S.D.N.Y. 2008); s*ee In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y.), *aff'd*, 117 F.3d 721 (2d Cir. 1997) ("'great weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts"); *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 173-74 (S.D.N.Y. 2000) (same); *Metro. Life*, 935 F. Supp. at 294 (same); *In re Elan Sec. Litig.*, 385 F. Supp. 2d 363, 369 (S.D.N.Y. 2005) (same). "'Absent fraud or collusion, [courts] should be hesitant to substitute [their] judgment for that of the parties who negotiated the settlement.'" *Clark v. Ecolab Inc*., 2010 WL 1948198, at *4 (S.D.N.Y. May 11, 2010) (alterations in original); *In re Advanced Battery Techs., Inc. Secs. Litig.*, 298 F.R.D. 171, 174 (S.D.N.Y. 2014) (same). The presumption of fairness applies here because the Settlement is the product of extensive arm's-length negotiations by well-informed, skilled, and experienced counsel. Sanders Decl., ¶21.

Significant weight should be attributed to the belief of experienced counsel that a settlement is in the best interest of those affected by the settlement. *In re NeuStar, Inc. Sec. Litig.*, 2015 U.S. Dist. LEXIS 165320, at *11-12 (E.D. Va. Dec. 8, 2015). Plaintiffs' Counsel are nationally recognized as leaders in the field of shareholder rights litigation and have decades of experience and an extensive track record of securing substantial recoveries for corporations and their shareholders. *See* Sanders Decl., ¶22; *see also* Sanders Decl., Ex. A, Firm Resume of Robbins Arroyo; Declaration of David C. Katz in Support of Plaintiffs' Motion for Final Approval of Derivative Settlement ("Katz Decl."), Ex. A, Firm Resume of WeissLaw. Defendants were vigorously represented by John S. Williams of Williams Connolly LLP and Arthur H. Ausfes III of Kramer Levin Naftalis & Frankel LLP—highly experienced practitioners from preeminent corporate defense firms. Misonix's Board, with the advice of its counsel, has determined in the exercise of its business judgment that the Settlement is fair, reasonable, and adequate; that the Reforms are significant and confer substantial benefits upon Misonix and its shareholders; and that the Settlement is in the best interests of the Company. Stipulation, ¶2.1.

Plaintiffs' Counsel's judgment that the value of the benefits guaranteed by the Settlement far outweighs the prospects for securing superior relief through further litigation is well-informed. "[T]he question is not whether the parties have completed a particular amount of discovery, but whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed or continuing to litigate it." *In re Educ. Testing Serv. Praxis Principles of Learning & Teaching, Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 620-21 (E.D. La. 2006); *see also In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) ("'formal discovery is not a necessary ticket to the bargaining table' where the parties have sufficient information to make an

informed decision about settlement""").  Here, the parties were eminently well-informed regarding the facts and law, and were well-positioned to evaluate the merits of the claims and defenses in the Action, as well as the proposed settlement terms.   Sanders Decl., ¶23.   The Settlement was negotiated only after Plaintiffs conducted a diligent investigation into the facts and legal claims, including, *inter alia*: (i) analyzing the Company's filings with the SEC; (ii) analyzing news reports and other information concerning the underlying matters alleged in the Complaint; (iii) analyzing nonpublic documents produced to Plaintiffs by Misonix reflecting analyses of the Company's prior and existing internal controls, certain actions being taken by the Company with respect to the FCPA issues raised in this litigation, and the status of the Company's efforts to enhance its internal controls; (iv) analyzing the pleadings and other papers filed in the securities class action; and (v) researching the applicable law with respect with the claims asserted in the Action and the potential defenses thereto.   After weighing the risks, costs, delays, and prospects for securing a better result through further litigation, Plaintiffs and Plaintiffs' Counsel determined that it is in the best interests of Misonix and its shareholders that the Action be fully and finally settled in the manner and upon the terms and conditions set forth in the Stipulation, and that those terms and conditions confer substantial benefits upon Misonix and Current Misonix Shareholders, and are fair, reasonable, adequate.   Stipulation, §II.

Moreover, Misonix's Board determined, in the exercise of its business judgment, that the Settlement confers substantial benefits on the Company and serves the best interest of Misonix and its shareholders.   Stipulation, §§III, IV.   The directors' exercise of business judgment with respect to litigation matters affecting the corporation is afforded significant deference by courts. *See Brooks v. Am. Exp. Indus., Inc*., 1977 U.S. Dist. LEXIS 17313, at *10 (S.D.N.Y. Feb. 17, 1977) ("The … decision of the AEI board to approve this settlement is appropriately afforded certain

deference; it is a business judgment with presumptive validity."); *see generally In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 746-47 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006).

C.     **Relevant *Grinnell* Factors Confirm the Fairness, Reasonableness, and Adequacy of the Settlement**

The Second Circuit's opinion in *Grinnell* sets out the factors to be considered in evaluating class action settlements.  495 F.2d at 462-63.  Courts evaluating derivative settlements under *Grinnell* consider: (i) the reasonableness of the recovery in light of the risks of establishing liability and damages, and the ability of the defendants to withstand a greater judgment; (ii) the complexity, expense, and likely duration of the litigation; (iii) the stage of the proceedings and discovery; and (iv) the reaction of shareholders to the proposed settlement.  *AOL*, 2006 WL 2572114, at *3-6 (applying select *Grinnell* factors to proposed settlement of shareholder derivative action); *see also D'Amato v. Deutsche Bank*, 236 F.3d 78, 86 (2d Cir. 2001) (same).  These factors weigh heavily in favor of final approval of the Settlement.

1.     **The Settlement Confers Substantial Benefits on Misonix**

In determining whether to approve a shareholder derivative settlement, "[t]he principal factor ... is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1311 (3d Cir. 1993) (omission in original).  Weighed against the substantial risk that continued litigation would yield no benefit while imposing substantial costs on Misonix, the recovery here is plainly fair, reasonable, and adequate. *See Grinnell*, 495 F.2d at 462.

Courts widely recognize that "a corporation may receive a 'substantial benefit' from a derivative suit ... regardless of whether the benefit is pecuniary in nature." *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 395 (1970); *see AOL*, 2006 WL 2572114, at *4 (non-monetary benefits alone can be "substantial enough to merit [settlement] approval").  A non-monetary benefit is sufficient

- 12 -

to support a settlement where it "'accomplishes a result which corrects or prevents an abuse which would be prejudicial to the rights and interests of the corporation or affect the enjoyment or protection of an essential right to the stockholder's interest.'"  *Mills*, 396 U.S. at 396; *see In re Pfizer Inc., S'holder Derivative Litig.*, 780 F. Supp. 2d 336, 342 (S.D.N.Y. 2011) (reforms "provide considerable corporate benefits ... in the form of a significantly improved institutional structure for detecting and rectifying the types of wrongdoing that have ... caused extensive harm to the company"); *Maher v. Zapata Corp.*, 714 F.2d 436, 461 (5th Cir. 1983) ("[T]he effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment in its favor.").

The Reforms negotiated here (*see* section III *supra*) will substantially enhance Misonix's FCPA programs, policies and procedures, strengthen the Company's FCPA compliance, and reduce the Company's exposure to FCPA violations and the substantial penalties that result therefrom.  Sanders Decl., ¶¶26-29.  Misonix has agreed to maintain all of these governance measures for a minimum of six (6) years—a meaningful amount of time intended to ensure the Reforms become embedded in the Company's policies, practices and corporate culture. Stipulation, Ex. 1, §§I.C., II.  Misonix and the Individual Defendants acknowledge and agree that the Reforms are significant and confer substantial benefits upon Misonix and its shareholders. Stipulation, ¶2.1.

## 2.   Continued Litigation Would Be Risky, Costly, and Time-Consuming

The Settlement guarantees the foregoing substantial benefits, and avoids the uncertainty, risks, costs, and delays in attempting to improve upon the result through further litigation.  *See Velez v. Novartis Pharm. Corp.*, 2010 WL 4877852, at *14 (S.D.N.Y. Nov. 30, 2010) ("As federal courts in this Circuit have consistently recognized, litigation inherently involves risks, and the

- 13 -

purpose of settlement is to avoid uncertainty."). These concerns are particularly significant in complex shareholder derivative litigation. *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995) ("the odds of winning [a] derivative lawsuit [a]re extremely small"); *AOL*, 2006 WL 2572114, at *3 ("'[B]ecause shareholder derivative actions are 'notoriously difficult and unpredictable, ... settlements are favored'.") (omission in original); *Lewis v. Newman*, 59 F.R.D. 525, 528 (S.D.N.Y. 1973) (same); *Cohn v. Nelson*, 375 F. Supp. 2d 844, 852 (E.D. Mo. 2005) (same). Unless a proposed settlement is clearly inadequate, final approval is preferable to the pursuit of complex, costly, time-consuming litigation with uncertain results. *See Grinnell*, 495 F.2d at 455 ("The proposed settlement cannot be judged without reference to the strength of plaintiffs' claims. 'The most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement.'"); *Metro. Life*, 935 F. Supp. at 294 ("In view of the effort and expense that would be required to take this case to and through trial, settlement would undoubtedly be in the best interest of all the parties and the policyholders."); *W. Va. v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970), *aff'd*, 440 F.2d 1079 (2d Cir. 1971) ("no matter how confident one may be of the outcome of the litigation, such confidence is often misplaced").

While Plaintiffs believe that the claims alleged in the Action are meritorious, continued litigation of the Action would be complex, costly, of substantial duration, and risky. Courts universally recognize that a derivative failure of oversight claim "is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *Wandel v. Dimon*, 23 N.Y.S. 3d 200, 202 (App. Div.—1st Dep't 2016) (quoting *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996)).

Plaintiffs would have had to overcome a motion to dismiss challenging the sufficiency of the allegations of demand futility. *See, e.g.*, *In re Omnicom Grp. Inc. S'holder Derivative. Litig*., 43 A.D.3d 766, 768 (1st Dep't 2007) ("presuit demand is the rule, [] excusing demand is the exception, and [] the exception should not be permitted to swallow the rule"); *Levy v. Huszagh*, 2012 WL 4512038, at *4 (E.D.N.Y. Sept. 28, 2012) (same); *Espinoza v. Dimon*, 790 F.3d 125 (2d Cir. 2015) (affirming dismissal of shareholder derivative complaint for failure to adequately plead demand futility). Even if Plaintiffs were to defeat that motion, the Board would likely have resorted to the appointment of a Special Litigation Committee to regain control of the claims and to seek to terminate them as unworthy of being pursued. *See, e.g.*, *St. Clair Shores Gen. Emps. Ret. Sys. v. Eibeler*, 2008 U.S. Dist. LEXIS 57546, at *17 (S.D.N.Y. July 30, 2008) (terminating derivative claims based on a special litigation committee report).

Had Plaintiffs cleared these hurdles, they would have faced extremely complex, costly and time-consuming litigation  Document discovery would need to be conducted, depositions would need to be taken, experts would need to be designated and expert discovery would need to be conducted. *See Metro. Life*, 935 F. Supp. at 293-94. It is by no means certain that Plaintiffs could secure evidence sufficient to overcome motions for summary judgment predicated on the business judgment rule, which affords directors the presumption that they acted on an informed basis and in the good faith belief that the actions taken were in the best interest of the company. *See Auerbach v. Bennett*, 393 N.E.2d 994, 1000 (1979). Summary judgment motions predicated on the exculpation and indemnification rights Misonix grants its directors also pose a serious threat because Plaintiffs could establish liability only by proving bad faith, intentional misconduct, or a knowing violation of law. *See* N.Y. Bus. Corp. Law §402(b).

The challenges involved in proving damages are equally daunting. *In re Lloyd's Am. Tr.*

- 15 -

*Fund Litig.*, 2002 WL 31663577, at *21 (S.D.N.Y. Nov. 26, 2002) ("The determination of damages … is a complicated and uncertain process, typically involving conflicting expert opinions. The reaction of a jury to such complex expert testimony is highly unpredictable."). Plaintiffs face a substantial risk that they would be precluded from even presenting expert damages testimony. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 585 (1993).

And, of course, victory at trial is no guarantee that the judgment would not be reversed on appeal. *See, e.g.*, *In re Apollo Grp., Inc. Sec. Litig.*, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd & remanded*, 2010 WL 5927988 (9th Cir. June 23, 2010) (holding evidence insufficient to support jury verdict for shareholders of $277 million); *Berkey Photo, Inc. v. Eastman Kodak Co*., 603 F.2d 263 (2d Cir. 1979) (reversing $87 million judgment after trial).

The Settlement eliminates the risks and costs of continued litigation, including the very real risk that no recovery would be secured for Misonix. *Novartis Pharm.*, 2010 WL 4877852, at *13 ("'Settlement at this juncture results in a substantial and tangible present recovery, without the attendant risk and delay' of post-trial motions and appeals."); *AOL*, 2006 WL 2572114, at *5 ("the prosecution of this action would require the Company to incur substantial costs"); *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 24 (2d Cir. 1987) (affirming settlement where potential defenses presented the "possibility of 'a lesser or no recovery after trial'").

### 3.    The Reaction of Shareholders Further Supports Settlement Approval

The "reaction of the class to settlement" can support approval, *Grinnell*, 495 F.2d at 463. Notice was disseminated to Current Misonix Shareholders in strict accordance with the procedures set out in the Preliminary Approval Order. The Notice informed Current Misonix Shareholders that the deadline to object to the proposed Settlement is July 16, 2019. To date, counsel has not heard from any shareholders indicating that they are not satisfied with the Settlement. Sanders

Decl., ¶37.  This is significant, especially considering that Misonix is owned by thousands of shareholders, including a number of sophisticated institutions (*e.g.*, Dimensional Fund Advisors L.P., The Vanguard Group, Inc.).  *See In re Citigroup Inc. Bond Litig.*, 296 F.R.D. 147, 156 (S.D.N.Y. 2013) (shareholder reaction supported settlement where "not one of the objections or requests for exclusion was submitted by an institutional investor"); *In re AOL Time Warner, Inc.*, 2006 WL 903236, at *10 (S.D.N.Y. Apr. 6, 2006) ("small number of objections … strongly favor[s] the Settlement" where "not a single institutional Class Member objected to the Settlement").  Even where a handful of objections are made, this factor weighs in favor of approval. *Strougo*, 258 F. Supp. 2d at 258 ("It has repeatedly been held that 'one indication of the fairness of a settlement is the lack of or small number of objectors.'"); *In re Delphi Corp. Sec., Derivative & "ERISA" Litig.*, 248 F.R.D. 483, 498-99 (E.D. Mich. 2008) (small number of objections indicate settlement's adequacy); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) (three objections out of tens of thousands of shareholders "'raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members'").

## V.   THE NEGOTIATED FEE AND EXPENSE AMOUNT IS REASONABLE

Pursuant to the "substantial benefit" doctrine, counsel who prosecute a shareholder derivative action that generates substantial benefits for the corporation are entitled to an award of reasonable attorneys' fees and expenses commensurate with the benefits' value and the risks of proceeding on a contingency basis.  *See Mills*, 396 U.S. at 394-96.  "[A] corporation may receive a 'substantial benefit' from a [stockholder's action], justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature....  [P]rivate stockholders' actions of this sort 'involve corporate therapeutics,' and furnish a benefit to all shareholders[.]"  *Id.*; *see also In re Oracle Sec. Litig.*, 852 F. Supp. 1437, 1445-50 (N.D. Cal. 1994) (changes in governance or operating procedures likely to produce monetary benefits or cost avoidance are "'fund creating actions'"

meriting award of attorneys' fees and expenses) (quoting *Tandycrafts, Inc. v. Initio Partners*, 562 A.2d 1162, 1164-65 (Del. 1989)).

As a result of Plaintiffs' Counsel's efforts, Misonix will enjoy long-term benefits flowing from the Reforms secured by the Settlement.  Sanders Decl., ¶ ¶26-29, 39.  The Reforms will help to prevent a recurrence of similar wrongdoing in the future, improve the Company's internal controls (particularly with respect to FCPA compliance), and lay the foundation for restoring the investor confidence necessary to attract new capital.  *See* section III *supra*.  The agreed upon Fee and Expense Amount of $500,000 is fair and reasonable in relation to the probable range of value of the Reforms, and the complexity of the matter, the litigation risks, and the substantial time and expenses Plaintiffs' Counsel devoted to the case on a fully contingent basis.  Sanders Decl., ¶39.

A.    **Legal Standards Governing Attorneys' Fees and Expenses**

In fashioning fee awards, courts in this Circuit consider: (i) the value of the benefit or recovery in relation to the amount of the fee; (ii) the magnitude and complexity of the litigation; (iii) the litigation risk (*i.e.*, the contingent nature of the fee); (iv) the quality of representation; (v) public policy considerations; and (vi) time and expenses incurred.  *Goldberger*, 209 F.3d at 50; *McDaniel v. Cty. of Schenectady*, 595 F.3d 411, 423 (2d Cir. 2010).

Here, the Court is not being called upon to fashion a fee and expense award; rather, it is being asked to determine whether the Fee and Expense Amount agreed to by well-represented parties in arm's-length negotiations and approved by the Board falls within the range of reasonableness.

Where the parties reach agreement on the award through arm's-length negotiations conducted after the material substantive terms of the settlement have been agreed upon with the assistance of an experienced mediator, the Court should give "substantial weight" to the negotiated

fee amount. *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 695 (N.D. Ga. 2001). *See Shapiro v. JPMorgan Chase & Co.*, 2014 WL 1224666, at *25 (S.D.N.Y. Mar. 24, 2014) ("That the Attorneys' Fee Payment was later separately negotiated weighs in favor of its reasonableness."); *In re Bear Stearns Companies Sec., Derivative & ERISA Litig.*, 909 F. Supp. 2d 259, 265 (S.D.N.Y. 2012) (fact that requested fee was product of negotiations supports approval); *In re Schering-Plough/Merck Merger Litig.*, 2010 WL 1257722, at *18 (D.N.J. Mar. 26, 2010) (negotiation of requested fee before a respected mediator weights in favor of approval). Indeed, the United States Supreme Court has endorsed the determination of attorneys' fees through agreement as the ideal to which litigants should strive. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("Ideally ... litigants will settle the amount of a fee.").

The parties' agreement and the Board's approval of the Fee and Expense Amount merit substantial deference. Misonix and their D&O insurers are by all counts sophisticated parties with every incentive to negotiate the lowest reasonable fee for the services rendered by Plaintiffs' Counsel. They were represented in the fee negotiations by skilled and experienced counsel. The negotiations were conducted at arm's-length with the assistance of an experienced mediator after the material substantive terms of the Settlement had been determined. Sanders Decl., ¶41. Unlike in class actions, where the diverging interests of class counsel and absent class members at the fee stage warrant close judicial scrutiny, in this shareholder derivative matter, Misonix participated in the negotiations, was represented by counsel, and had every incentive to negotiate the lowest reasonable fee for the services rendered by Plaintiffs' Counsel. *Id*. Accordingly, the parties' conclusion that the agreed Fee and Expense Amount is fair and reasonable is entitled to substantial deference.

**B.     The *Goldberger* Factors Confirm the Reasonableness of the Negotiated Fee and Expense Amount**

**1.     The Fee and Expense Amount Is Reasonable in Light of the Benefits Conferred**

Counsel responsible for a corporation's decision to adopt corporate governance enhancements that address the deficiencies alleged to have permitted the wrongdoing and designed to prevent recurrence of the same or similar wrongdoing are entitled to a fee award reflecting the significant economic value conferred.  *See Mills*, 396 U.S. at 396 ("'corporate therapeutics' … furnish a benefit to all shareholders" warranting fee award); *Maher*, 714 F.2d at 461 & n.43 (improvements in "the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment in its favor.…  The evaluation of such an economic impact is necessarily judgmental and imprecise and normally does not lend itself to meaningful quantification," but that does not "obviate[] the desirability of an express range of recovery analysis" for purposes of awarding fees); *Oracle*, 852 F. Supp. at 1445-50 (similar).

As discussed in detail in section III *supra*, the Settlement directly addresses the alleged wrongdoing, targeting areas that are at the heart of Plaintiffs' claims: ensuring compliance with the FCPA through rigorous oversight mechanisms and strong internal controls.  The Reforms will not only prevent recurrence of the alleged wrongdoing, they will improve the Company's policies and procedures for ensuring legal and regulatory compliance and will help restore investor confidence. Sanders Decl., ¶42.  The cumulative value of the Reforms easily justifies the negotiated Fee and Expense Amount.  *See, e.g.*, *In re Schering-Plough Corp. S'holders Derivative Litig.*, 2008 WL 185809, at *1, *5 (D.N.J. Jan. 14, 2008) (awarding $9.5 million fee based on benefits conferred by governance reforms) ("This litigation provides an example of how derivative actions that result in the adoption of rigorous compliance standards confer tangible benefits to the corporation and

its shareholders…. The adoption of the corporate governance and compliance mechanisms required by the settlement can prevent breakdowns in oversight that would otherwise subject the company to the risk of regulatory action, or uncover and remedy a problem at the early stages before it becomes the subject of a government investigation. Effective corporate governance can also affect stock price by bolstering investor confidence and improving consumer perceptions."); *Unite Nat'l Ret. Fund v. Watts*, 2005 WL 2877899, at \*5 (D.N.J. Oct. 28, 2005) (awarding $9.2 million fee for governance reforms) ("[T]he great benefit conferred … as a result of the new corporate governance principles provided for in the settlement agreement … will serve to prevent and protect [the company] from the reoccurrence of certain alleged wrongdoings.").

    **2.**    **The Skill Demonstrated by Plaintiffs' Counsel Supports the Agreed Fee and Expense Amount**

Courts reward counsel who bring complex matters to a successful early resolution. *See, e.g.*, *In re Ashanti Goldfields Sec. Litig.*, 2005 WL 3050284, at \*4 (E.D.N.Y. Nov. 15, 2005) ("The 'quality of representation' factor is designed to reward 'particularly resourceful' legal work that 'secures a substantial benefit … with a minimum of time invested.'") (omission in original); *Int'l Distrib. Ctrs, Inc. v. Walsh Trucking Co., Inc.*, 62 B.R. 723, 737 (S.D.N.Y. 1986) (same). "The quality of opposing counsel is also important in evaluating the quality of plaintiff's counsels' work." *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 749 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986); *Grinnell*, 495 F.2d at 471 (same). As discussed, this was a complex matter, involving many difficult factual and legal issues. Plaintiffs' Counsel demonstrated significant skill in negotiating a strong package of valuable corporate therapeutics despite the challenges facing Plaintiffs' ability to recover anything for the Company in this derivative litigation. Defendants were well-represented by pre-eminent corporate defense firms, whose lawyers zealously defended their clients' interests. Sanders Decl., ¶43.

### 3. The Contingency Risk Borne by Plaintiffs' Counsel Supports the Agreed Fee and Expense Amount

The Fee and Expense Amount is particularly reasonable in light of Plaintiffs' Counsel's risk of non-payment. *See Goldberger*, 209 F.3d at 54 (risk of non-payment important factor in determining attorneys' fees); *Grinnell*, 495 F.2d at 471 ("Perhaps the foremost of [the less objective] factors is the attorney's 'risk of litigation,' *i.e.*, the fact that, despite the most vigorous and competent of efforts, success is never guaranteed."). Had Plaintiffs' Counsel failed to secure a substantial benefit for Misonix, they would have recovered nothing for their time and expenses invested in this complex and risky litigation. Sanders Decl., ¶44. As discussed, Plaintiffs' Counsel faced tremendous litigation risks in pursuing the Action. *Id.* These risks and the benefits secured for Misonix and its shareholders fully justify the approval of the Fee and Expense Amount. *See, e.g.*, *Cohn*, 375 F. Supp. 2d at 863, 865-66 ("[I]t is imperative that the filing of contingent class action and derivative lawsuits not be chilled by the failure to award attorneys' fees or by the imposition of fee awards that fail to adequately compensate counsel for the risks of pursuing such litigation.… [B]ecause of the complexity and societal importance of stockholder and derivative litigation, the most able counsel should be obtained. The attorneys' fees awarded should reflect this goal.") (citing *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985)).

### 4. The Substantial Time and Expense Devoted to the Litigation Supports the Agreed Fee and Expense Amount

Plaintiffs' Counsel devoted a total of 671.10 hours to the litigation over the course of more than two years. Sanders Decl., ¶¶45, 49; Katz Decl., ¶4. This time was spent on tasks that led directly to the recovery, including: (i) analyzing the Company's filings with the SEC; (ii) analyzing news reports and other information concerning the underlying matters alleged in the complaints; (iii) analyzing nonpublic documents produced to Plaintiffs by Misonix reflecting analyses of the Company's prior and existing internal controls, certain actions being taken by the Company with

respect to the FCPA issues raised in this litigation, and the status of the Company's efforts to enhance its internal controls; (iv) analyzing the pleadings and other papers filed in the securities class action; (v) researching the applicable law with respect with the claims asserted in the Action and the potential defenses thereto; and (vi) developing and negotiating a comprehensive and detailed governance and oversight reform package.  Sanders Decl., ¶45; Stipulation, §II.

Plaintiffs' Counsel incurred $14,095.35 in expenses performing these tasks.  Sanders Decl., ¶¶50, 51; Katz Decl., ¶6.  These expenses were necessary to effectively prosecute and resolve the case on favorable terms, would have been billed in non-contingency matters, and are properly reimbursed.  *Id*.; *see Novartis Pharm*., 2010 WL 4877852, at *24 ("'It is well-established that counsel who create a common fund … are entitled to the reimbursement of [all reasonable] litigation costs and expenses.'") (omission and alteration in original).

A lodestar cross-check is unnecessary because the agreed Fee and Expense Amount would not confer a windfall.  *Goldberger*, 209 F.3d at 48-50.  Regardless, a cross-check further confirms the reasonableness of the agreed fee amount.  The firms of Robbins Arroyo and WeissLaw report lodestar totaling $364,811.75.  Sanders Decl., ¶54; Katz Decl., ¶4.  The negotiated $500,000 Fee and Expense Amount represents a lodestar multiplier of 1.33—well below the range deemed reasonable in this type of litigation. *See Wal-Mart Stores v. Visa U.S.A. Inc.*, 396 F.3d 96, 123 (2d Cir. 2005) (affirming multiplier of 3.5); *Bozak v. FedEx Ground Package Sys., Inc.*, 2014 WL 3778211, at *7 (D. Conn. July 31, 2014) ("'Courts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers.'"); *In re Comverse Tech., Inc. Sec. Litig*., 2010 WL 2653354, at *5 (E.D.N.Y. June 24, 2010) (awarding fee representing 2.78 multiplier) (counsel who litigate "complex case under a contingency fee arrangement … are entitled to a fee in excess of the lodestar"); *Novartis Pharm*., 2010 WL 4877852, at *23 (awarding

- 23 -

multiplier of 2.4, which "falls well within (indeed, at the lower end) of the range of multipliers accepted within the Second Circuit") (collecting cases approving multipliers from 2.09 to 5.5); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 354 (S.D.N.Y. 2005) (awarding multiplier of 4); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (awarding 3.97 multiplier and noting multipliers between 3 and 4.5 are common); *Lloyd's Am. Tr.*, 2002 WL 31663577, at *27 ("multiplier of 2.09 is at the lower end of the range of multipliers awarded by courts within the Second Circuit").

### 5.    Public Policy Supports the Agreed Fee and Expense Amount

Derivative actions play an important role in "protect[ing] the interests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers.'"  *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991); *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 371 (1966) (derivative suits play "important role in protecting shareholders of corporations from the designing schemes and wiles of insiders"); *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 548 (1949) (derivative action is "the chief regulator of corporate management … without it there would be little practical check on [management] abuses").  This would not be possible absent appropriate fee incentives to attract skilled and experienced counsel.  *See In re AOL Time Warner S'holder Derivative Litig.*, 2010 WL 363113, at *23 (S.D.N.Y. Feb. 1, 2010) (fee award should incentivize "future counsel to devise remedies as an alternative to money, strengthening corporate America in the long run through innovation and prophylaxis").

### C.    The Service Awards to Plaintiffs Are Reasonable

Plaintiffs respectfully request that the Court approve nominal service awards of $3,000 for each of the two named Plaintiffs—to be paid from the Fee and Expense Amount—in recognition of their role in creating substantial benefits for Misonix and its shareholders.  Stipulation, ¶4.2.

*See In re Presidential Life Sec.*, 857 F. Supp. 331, 337 (S.D.N.Y. 1994) (incentive awards "need not be subjected to intense scrutiny inasmuch as these funds will come out of the attorneys' fees").

Plaintiffs reviewed and authorized the filing of the complaints, stayed informed throughout the course of the litigation, and supervised counsels' litigation and settlement efforts.  *See* Sanders Decl., ¶56; Katz Decl., ¶8; *see Lizondro–Garcia v. Kefi LLC*, 2014 WL 4996248, at *9 (S.D.N.Y. Oct. 7, 2014) (service awards common in shareholder representative actions); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 150 (S.D.N.Y. 2010) (service awards properly reward plaintiffs' leadership); *In re Cendant Corp. Derivative Action Litig.*, 232 F. Supp. 2d 327, 344 (D.N.J. 2002) (service awards recognize plaintiffs' public service).  The service awards are well within the range approved by courts as fair and reasonable, and should be approved.  *See, e.g.*, *Sauby v. City of Fargo*, 2009 WL 2168942, at *1 (D.N.D. July 16, 2009) (approving awards of $5,000 and $10,000 not "to 'compensate' plaintiffs, but instead serve to encourage people with legitimate claims to pursue the action"); *Geare v. Begley*, No. 11-cv-09074, Final Order and Judgment, ¶3 (N.D. Ill. Jan. 23, 2015) (awarding $3,000 per plaintiff), Sanders Decl., Ex. B; *In re Xcel Energy, Inc. Sec. Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 1000 (D. Minn. 2005) (approving award of $100,000 for eight lead plaintiffs) ("if there were no individual shareholders willing to step forward and pursue a claim on behalf of other investors, many violations of law might go unprosecuted").

## VI.    CONCLUSION

The Settlement is fair, reasonable, and adequate and should be approved in all respects.

Dated: July 12, 2019                               Respectfully submitted,

                                                   ROBBINS ARROYO LLP

                                                   */s/ Shane P. Sanders*
                                                   SHANE P. SANDERS

                                                   BRIAN J. ROBBINS
                                                   CRAIG W. SMITH

- 25 -

SHANE P. SANDERS
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile:  (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
csmith@robbinsarroyo.com
ssanders@robbinsarroyo.com

WEISSLAW LLP
JOSEPH H. WEISS
DAVID C. KATZ

*/s/ David C. Katz*
DAVID C. KATZ
1500 Broadway, 16th Floor
New York, NY 10036
Telephone: (212) 682-3025
Facsimile: (212) 682-3010
E-mail: jweiss@weisslawllp.com
dkatz@weisslawllp.com

*Co-Lead Counsel for Plaintiffs*

1373685

- 26 -

## <u>CERTIFICATE OF SERVICE</u>

I, Shane P. Sanders, hereby certify that on July 12, 2019, I caused a true and correct copy

of the attached:

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR
FINAL APPROVAL OF DERIVATIVE SETTLEMENT

to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send

notification of such public filings to all counsel registered to receive such notice.


*/s/ Shane P. Sanders*
SHANE P. SANDERS